DEBRA A. GURLIACCI ET AL. *v.* GEORGE MAYER ET AL.
(13961)
(13962)
(13963)

PETERS, C. J., GLASS, COVELLO, HULL and BORDEN, Js.

532

Argued December 11, 1990—decision released May 7, 1991

*Frank W. Murphy,* for the appellant in Docket No. 13963 (intervening plaintiff).

*Kenneth B. Povodator,* assistant corporation counsel, with whom, on the brief, was *Mary E. Sommer,* corporation counsel, for the appellant-appellee in Docket No. 13961 (named defendant).

*Richard S. Scalo,* with whom were *Ronald D. Japha* and, on the brief, *Abraham I. Gordon,* for the appel-

lants in Docket No. 13962, appellees-appellants in Docket No. 13961 and appellees in Docket No. 13963 (named plaintiff et al.).

BORDEN, J. This consolidated appeal arises out of an alleged automobile accident between the named plaintiff, Debra A. Gurliacci,[1] and the named defendant, George Mayer.[2] The plaintiff, a Stamford police officer, claimed that while on patrol in February, 1983, she suffered injuries to her back when Mayer, then the deputy chief of the Stamford police department, struck the rear of her unmarked police car as he was driving while intoxicated. Due to her injuries, the plaintiff was unable to continue working as a police officer, but continued to collect her full salary. The jury found in favor of the plaintiff and awarded her $485,000. The city of Stamford, which had intervened in the suit as a plaintiff pursuant to General Statutes § 31-293 (a),[3] sought

[1] Louis Gurliacci, the named plaintiff's husband, also sued for loss of consortium. The trial court, *Cioffi, J.,* rendered a summary judgment against him on that claim because at the time of the alleged accident the plaintiff and Louis Gurliacci were not married. Louis Gurliacci pursues his claim in his cross appeal against the named defendant, George Mayer. For convenience and clarity, we refer herein to Debra Gurliacci as the plaintiff; to George Mayer as Mayer; to Louis Gurliacci by name; and to the city of Stamford, see footnote 2, infra, as Stamford.

[2] At the initiation of the lawsuit, the plaintiff and Louis Gurliacci also named the city of Stamford as a defendant. Stamford was later eliminated as a defendant pursuant to a motion to strike, but it thereafter intervened as a plaintiff seeking reimbursement under the Workers' Compensation Act.

[3] General Statutes § 31-293 (a) provides: "LIABILITY OF THIRD PERSONS TO EMPLOYER AND EMPLOYEE. LIMITATIONS ON LIABILITY OF ARCHITECTS AND ENGINEERS. LIMITATIONS ON LIABILITY OF INSURERS, SELF-INSURANCE SERVICE ORGANIZATIONS AND UNIONS RELATING TO SAFETY MATTERS. (a) When any injury for which compensation is payable under the provisions of this chapter has been sustained under circumstances creating in some other person than the employer a legal liability to pay damages in respect thereto, the injured employee may claim compensation under the provisions of this chapter, but the payment or award of compensation shall not affect the claim or right of action of such injured employee against such

to recover from the jury award, inter alia, two thirds of the amount that it had paid to the plaintiff as salary following her injury, asserting that such percentage represented workers' compensation payments. The trial court determined, however, that the salary was paid pursuant to a collective bargaining agreement that

other person, but such injured employee may proceed at law against such person to recover damages for such injury; and any employer having paid, or having become obligated to pay, compensation under the provisions of this chapter may bring an action against such other person to recover any amount that he has paid or has become obligated to pay as compensation to such injured employee. If either such employee or such employer brings such action against such third person, he shall forthwith notify the other, in writing, by personal presentation or by registered or certified mail, of such fact and of the name of the court to which the writ is returnable, and such other may join as a party plaintiff in such action within thirty days after such notification, and, if such other fails to join as a party plaintiff, his right of action against such third person shall abate. In any case in which an employee brings an action against a third party in accordance with the provisions of this section, and the employer is a party defendant in such action, the employer may join as a party plaintiff in such action. The bringing of any such action against an employer shall not constitute notice to such employer within the meaning of this section. If such employer and employee join as parties plaintiff in such action and any damages are recovered, such damages shall be so apportioned that the claim of the employer, as defined in this section, shall take precedence over that of the injured employee in the proceeds of such recovery, after the deduction of reasonable and necessary expenditures, including attorneys' fees, incurred by the employee in effecting such recovery. The rendition of a judgment in favor of the employee or the employer against such party shall not terminate the employer's obligation to make further compensation, including medical expenses, which the compensation commissioner thereafter deems payable to such injured employee. If the damages, after deducting the employee's expenses as provided above, are more than sufficient to reimburse the employer, damages shall be assessed in his favor in a sum sufficient to reimburse him for his claim, and the excess shall be assessed in favor of the injured employee. No compromise with such third person by either employer or employee shall be binding upon or affect the rights of the other, unless assented to by him. For the purposes of this section the employer's claim shall consist of (1) the amount of any compensation which he has paid on account of the injury which is the subject of the suit and (2) an amount equal to the present worth of any probable future payments which he has by award become obligated to pay on account of such injury. The word 'compensation', as used in this section, shall be construed to include not only incapacity payments to an

provided for unlimited sick leave in the place of workers' compensation. Mayer and Stamford appealed from the judgment of the trial court, and the plaintiff and Louis A. Gurliacci cross appealed.[4] We transferred the appeals from the Appellate Court to ourselves pursuant to Practice Book § 4023. We reverse, and order a new trial.

The relevant portions of the complex procedural history of this consolidated appeal are as follows. On February 2, 1983, the alleged accident between the plaintiff and Mayer occurred. On February 1, 1985, one day before the statute of limitations on the action passed, the plaintiff served her first complaint against Mayer and Stamford. On April 2, 1985, Mayer and Stamford moved to dismiss the action for lack of subject matter jurisdiction based on the fellow employee immunity provision of General Statutes (Rev. to 1983) § 7-465.[5] On May 10, 1985, the plaintiff requested per-

injured employee and payments to the dependents of a deceased employee, but also sums paid out for surgical, medical and hospital services to an injured employee, the one-thousand-dollar burial fee provided by law and payments made under the provisions of sections 31-312 and 31-313."

[4] The plaintiff withdrew her individual appeal and was given permission by this court to present her claims by cross appeal.

[5] General Statutes (Rev. to 1983) § 7-465 provides in pertinent part: "ASSUMPTION OF LIABILITY FOR DAMAGE CAUSED BY EMPLOYEES. JOINT LIABILITY OF MUNICIPALITIES IN DISTRICT DEPARTMENT OF HEALTH OR REGIONAL PLANNING AGENCY. (a) Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such municipality, except firemen covered under the provisions of section 7-308, all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as hereinafter set forth, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty. This section shall not apply to physical injury to a person caused by an employee to a fellow employee while

mission of the court to amend her complaint. The plaintiff's request was granted over Mayer's objection. On May 30, 1985, the court, *McGrath, J.,* denied the motion to dismiss for lack of subject matter jurisdiction.

Thereafter, Stamford moved to strike the third count of the plaintiff's amended complaint alleging liability

both employees are engaged in the scope of their employment for such municipality if the employee suffering such injury or, in the case of his death, his dependent has a right to benefits or compensation under chapter 568 by reason of such injury. If an employee or, in the case of his death, his dependent has a right to benefits or compensation under chapter 568 by reason of such injury or death caused by the negligence or wrong of a fellow employee while both employees are engaged in the scope of their employment for such municipality, such employee or, in the case of his death, his dependent shall have no cause of action against such fellow employee to recover damages for such injury or death unless such wrong was wilful and malicious. This section shall not apply to libel or slander proceedings brought against any such employee and, in such cases, there is no assumption of liability by any town, city or borough. Any employee of such municipality, although excused from official duty at the time, for the purposes of this section shall be deemed to be acting in the discharge of duty when engaged in the immediate and actual performance of a public duty imposed by law. Such municipality may arrange for and maintain appropriate insurance or may elect to act as a self-insurer to maintain such protection. No action for personal physical injuries or damages to real or personal property shall be maintained against such municipality and employee jointly unless such action is commenced within two years after the cause of action therefor arose nor unless written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued. Governmental immunity shall not be a defense in any action brought under this section. In any such action the municipality and the employee may be represented by the same attorney if the municipality, at the time such attorney enters his appearance, files a statement with the court, which shall not become part of the pleadings or judgment file, that it will pay any verdict rendered in such action against such employee. No mention of any kind shall be made of such statement by any counsel during the trial of such action. As used in this section, 'employee' shall include a member of a town board of education and any teacher, including a student teacher doing practice teaching under the direction of such a teacher, or other person employed by such board. Nothing in this section shall be construed to abrogate the right of any person, board or commission which may accrue under section 10-235.''

of Stamford based on the negligence of its agent and servant Mayer, and to strike the sixth count alleging liability of Stamford to Louis Gurliacci for loss of consortium. The court, *McGrath, J.*, granted the motion to strike, thereby eliminating Stamford as a defendant.

Mayer moved for summary judgment on the fourth and fifth counts of the plaintiff's complaint, relating to Louis Gurliacci's claim against Mayer for loss of consortium. The court, *Cioffi, J.*, granted the motion for summary judgment.

Mayer then moved to amend his special defenses to include a claim that the plaintiff's amended complaint was barred by the statute of limitations, General Statutes § 52-584.[6] The court, *Lewis, J.*, allowed the amendment over the plaintiff's objection. Mayer then moved for summary judgment on the first two counts of the plaintiff's complaint, claiming that they were barred by fellow employee immunity and exclusivity of remedy provided by the Workers' Compensation Act. The court, *Lewis, J.*, denied the motion for summary judgment, and thereafter granted the plaintiff's motion to strike Mayer's special defense relating to the expiration of the statute of limitations.

On March 21, 1989, Stamford filed a motion to intervene as a plaintiff pursuant to General Statutes § 31-293 (a), claiming that it was not barred by the

---

[6] General Statutes § 52-584 provides: "LIMITATION OF ACTION FOR INJURY TO PERSON OR PROPERTY. No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

statutory thirty-day requirement for intervention because the plaintiff had never served it with statutory notice. The court, *Cioffi, J.,* granted the motion to intervene. The plaintiff thereafter moved to dismiss Stamford's intervening complaint, and the court denied the motion.

Eventually, the case proceeded to trial. The court, *Lewis, J.,* bifurcated the proceedings, with the issues of liability and damages and the issue of the exclusivity of the Workers' Compensation Act tried separately. The jury determined that Mayer was negligent and awarded damages to the plaintiff in the sum of $485,000. The court denied Mayer's motion to set aside the verdict. Thereafter, Stamford moved for apportionment of damages, and the court granted the motion in part.

The jury could reasonably have found the following facts. On February 2, 1983, at approximately 1:30 a.m., the plaintiff, a Stamford police officer, was on patrol in an unmarked police car. As she was driving south on Glenbrook Road, the plaintiff noticed that the car behind her was driving very close to her, flashing its high beams, and then retreating. After this had occurred numerous times, she made a left turn onto Ely Place in order to allow the car to pass and to determine why the car was following her. The other car likewise turned onto Ely Place, and hit the rear of the plaintiff's car causing her to be thrown around the inside of her car.

The plaintiff exited her car and approached the other car. At that time, she learned that the other driver was Mayer, the deputy chief of police of Stamford, who was also driving an unmarked police car. Mayer was intoxicated and abusive, having consumed four to six scotches with water in the preceding four to six hours.

Mayer claimed that he had been engaged in surveillance of an organized crime figure driving a gold Cadillac, and that he was trying to locate the Cadillac when the accident occurred.

The plaintiff summoned other officers to the scene. Those officers filed reports describing Mayer as intoxicated and abusive to the plaintiff and to them. At that time, the plaintiff reported no injuries, and finished her shift.

The next day, the plaintiff was sore and suffering from a stiff neck and pain in her shoulder blades. Upon arriving at work, she reported her injuries to the police department and went to Stamford Hospital for medical attention. Also at that time, the plaintiff examined the rear bumper of her car and noticed slight damage, which she reported to the police department.

The plaintiff intermittently missed work for one and one-half years as a result of neck and back pain. The jury also could have found that the plaintiff has been totally incapacitated from working as a police officer since July, 1984. From 1983 to 1986, the plaintiff was under the care of numerous doctors for treatment of her neck and back injuries. Since the accident, the plaintiff has been admitted to Stamford Hospital and St. Raphael's Hospital, and has undergone extensive medical treatment and surgery for a herniated disk. She is presently suffering from a disability of her back, and, according to medical testimony, may never return to police work.

## I

### MAYER'S APPEAL

On his appeal, Mayer claims that the court improperly: (1) refused to allow evidence of the plaintiff's continued receipt of full pay as evidence of malingering;

(2) charged the jury that fellow employee immunity under General Statutes § 7-465 required a separate element of "capability"; (3) struck his special defense based upon the statute of limitations; General Statutes § 52-584; (4) denied his motion to dismiss based upon lack of subject matter jurisdiction;[7] and (5) refused to allow follow-up questions to a witness after questioning by the jurors. Because we agree with Mayer as to his first and second claims as stated above, a new trial is required.

## A

We first consider Mayer's claim that the court improperly denied his motion to dismiss the plaintiff's original complaint for lack of subject matter jurisdiction. This claim raises the issue of whether a motion to dismiss is the correct procedural vehicle with which to challenge a complaint that, on its face, alleges a cause of action falling under the fellow employee immunity rule. General Statutes (Rev. to 1983) § 7-465 (a)[8] provides that "[i]f an employee . . . has a right to benefits or compensation under chapter 568 [the Workers' Com-

---

[7] Mayer also claims that the trial court improperly denied his motion for summary judgment. Without reaching the merits of this claim, we disagree.

We now adopt the Appellate Court's rationale that, absent exceptional circumstances, "a denial of a motion for summary judgment is not appealable where a full trial on the merits produces a verdict against the moving party." *Greengarden* v. *Kuhn,* 13 Conn. App. 550, 552, 537 A.2d 1043 (1988). The basis of this policy is that "even if the motion is improperly denied, the error is not reversible; the result has merged into the subsequent decision on the merits. To hold otherwise would be 'to depart from this sound policy which allows a decision based on more evidence to preclude review of a decision made on less evidence.' " *Bristol* v. *Vogelsonger,* 21 Conn. App. 600, 601 n.2, 575 A.2d 252 (1990), quoting *Greengarden* v. *Kuhn,* supra; see also *Denby* v. *Voloshin Cadillac, Inc.,* 3 Conn. App. 181, 181–82 n.3, 485 A.2d 1360, cert. dismissed, 196 Conn. 802, 491 A.2d 1105 (1985). From a review of the record, we conclude that this case does not represent an exceptional circumstance that would justify reviewing on appeal a denial of a motion for summary judgment.

[8] See footnote 5, supra.

pensation Act] by reason of such injury . . . caused by the negligence or wrong of a fellow employee while both employees are engaged in the scope of their employment for such municipality, such employee . . . *shall have no cause of action against such fellow employee* to recover damages for such injury or death unless such wrong was wilful and malicious." (Emphasis added.) The plaintiff's original complaint, dated February 2, 1985, alleged only that Mayer "was operating an automobile owned by the defendant, the city of Stamford," and that, at all times relevant, Mayer "was the servant, agent and/or employee of the City of Stamford." A reasonable reading of that complaint discloses no allegations asserting that Mayer had been acting either outside the scope of his employment or wilfully or maliciously.

Mayer claims that the language of § 7-465 deprived the trial court of subject matter jurisdiction because the allegations of the plaintiff's complaint alleged a cause of action in negligence between fellow municipal employees. Therefore, Mayer argues, the court was required to grant the motion to dismiss. We disagree.

" 'Subject matter jurisdiction is the power of the court to hear and determine cases of the general class to which the proceedings in question belong.' " *LeConche* v. *Elligers,* 215 Conn. 701, 709, 579 A.2d 1 (1990), quoting *Shea* v. *First Federal Savings & Loan Assn. of New Haven,* 184 Conn. 285, 288, 439 A.2d 997 (1981). We begin with the premise that the Superior Court has subject matter jurisdiction over negligence suits between fellow employees where the injury arose when the employee was acting outside the scope of employment or wilfully or maliciously. General Statutes § 7-465. The question, therefore, is whether the failure of the plaintiff to allege sufficient facts to fall within either of these two exceptions deprived the court of subject matter

jurisdiction, so that a motion to dismiss was the proper procedural vehicle, or whether such a pleading failure merely deprived the complaint of a legally sufficient cause of action, so that a motion to strike was the proper procedural vehicle. "That determination must be informed by the established principle that every presumption is to be indulged in favor of jurisdiction." *LeConche* v. *Elligers,* supra, 709–10.

Our case law demonstrates that parties have employed and we have reviewed both motions to dismiss and motions to strike as procedures by which to challenge a complaint on the grounds that a cause of action falling under the fellow employee immunity rule was properly relegated to the workers' compensation commission. Compare *McKinley* v. *Musshorn,* 185 Conn. 616, 441 A.2d 600 (1981) (motion to dismiss), and *Pallanck* v. *Donovan,* 105 Conn. 591, 136 A. 471 (1927) (plea in abatement), with *Edmundson* v. *Rivera,* 169 Conn. 630, 363 A.2d 1031 (1975) (demurrer to complaint), and *Hope* v. *Cavallo,* 163 Conn. 576, 316 A.2d 407 (1972) (demurrer for failure to state cause of action). Furthermore, in those cases where a motion to dismiss for lack of subject matter jurisdiction was used, the parties did not explicitly raise the issue of the propriety of the procedural posture. See, e.g., *McKinley* v. *Musshorn,* supra. We do not read our case law, therefore, as conclusively deciding that such a claim is subject matter jurisdictional.

Mayer argues that the court lacked subject matter jurisdiction because "[t]he Workers' Compensation Commission has exclusive jurisdiction over intraworkplace claims, unless an exception is satisfied." Mayer overlooks, however, the fact that the exclusivity of the workers' compensation commission is not absolute, because § 7-465 provides that a municipal employee has a cause of action for negligence against

a fellow employee for injuries occurring while that employee was acting (1) outside the scope of employment or (2) wilfully and maliciously. Mayer does not dispute that, had the plaintiff's original complaint alleged either exception, the case would have been properly before the trial court.

Therefore, the fact that the plaintiff's complaint failed to allege facts that would have removed it from the operation of the fellow employee immunity rule merely reflects that the complaint failed to state a legally sufficient cause of action. Practice Book § 152. We have previously held that if a "pleading . . . on its face is legally insufficient, although facts may indeed exist which, if properly pleaded, would establish a cause of action upon which relief could be granted," a motion to strike is required. *Baskin's Appeal from Probate,* 194 Conn. 635, 640, 484 A.2d 934 (1984); see also Practice Book § 152. A motion to dismiss, by contrast, "properly attacks the jurisdiction of the court, essentially asserting that the plaintiff *cannot* as a matter of law and fact state a cause of action that should be heard by the court." (Emphasis in original.) *Baskin's Appeal from Probate,* supra. In this case, Mayer's motion in effect challenged the failure of the plaintiff's original complaint to invoke the statutory exceptions to the fellow employee immunity rule. Because this challenge was to the legal sufficiency of the complaint, Mayer's motion to dismiss was improper.

An examination of the result of Mayer's argument further supports our conclusion. Interpreting the language of § 7-465 as subject matter jurisdictional, taken to its logical conclusion, would require a trial court, after trial, to dismiss for lack of subject matter jurisdiction a complaint that at the outset properly alleged an exception to the fellow employee immunity rule, if the factfinder ultimately concluded that the defendant

employee was neither (1) acting outside the scope of his employment or (2) acting wantonly or maliciously. Thus, the court would be compelled to conclude that it had no subject matter jurisdiction over the case that it had tried solely because the plaintiff failed to establish an essential element of his cause of action. We decline to adopt such a bizarre interpretation of § 7-465.

Because of our determination that the plaintiff's complaint was within the trial court's subject matter jurisdiction, albeit subject to a motion to strike for failure to state a legally sufficient claim, we now determine whether the trial court properly considered the plaintiff's motion to amend the complaint before ruling on the motion to dismiss. We conclude that the trial court should not have allowed the amendment before ruling on the motion to dismiss, but we determine that this was harmless in light of our conclusion that the defect in the plaintiff's original complaint was not jurisdictional in nature.

It is axiomatic that once the issue of subject matter jurisdiction is raised, it must be immediately acted upon by the court. *Statewide Grievance Committee* v. *Rozbicki,* 211 Conn. 232, 245, 558 A.2d 986 (1989); *Cahill* v. *Board of Education,* 198 Conn. 229, 238, 502 A.2d 410 (1985). In this case, the trial court allowed the plaintiff to amend her complaint prior to ruling on the motion to dismiss. By considering the motion to amend prior to ruling on the challenge to the court's subject matter jurisdiction, the court acted inconsistently with the rule that, as soon as the jurisdiction of the court to decide an issue is called into question, all other action in the case must come to a halt until such a determination is made. *Statewide Grievance Committee* v. *Rozbicki,* supra. This action of the trial court was harmless, however, because, even had the motion to dismiss been heard prior to the amendment of the complaint, it should have been denied.

B

We next consider Mayer's claim that the trial court improperly struck his special defense that the plaintiff's amendment of her complaint was barred by the two year negligence statute of limitations set forth in General Statutes § 52-584.[9] We disagree.

The alleged accident occurred on February 2, 1983. On February 1, 1985, the plaintiff's first complaint was served on Mayer. This complaint alleged that Mayer was acting negligently in operating his automobile while intoxicated, thereby injuring the plaintiff. After the limitations period had passed, the court allowed the plaintiff to amend her complaint to add the allegations that Mayer was acting either wilfully, wantonly and maliciously, or outside the scope of his employment.

Mayer raised the special defense that the amended complaint was barred by the statute of limitations because it stated a new cause of action that did not relate back to the original complaint. The court, *Lewis, J.,* granted the plaintiff's motion to strike this defense. The parties agree that if the amended complaint did not relate back to the original complaint, the plaintiff's ultimate cause of action was barred by the statute of limitations. *Sharp* v. *Mitchell,* 209 Conn. 59, 71–72, 546 A.2d 846 (1988). We conclude that the amendment related back and that, therefore, the court properly granted the motion to strike the special defense. *Giglio* v. *Connecticut Light & Power Co.,* 180 Conn. 230, 240, 429 A.2d 486 (1980).

" 'A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff

---

[9] See footnote 6, supra.

to relief. . . . "A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action." *Pavelka* v. *St. Albert Society,* 82 Conn. 146, 147, 72 A. 725 [1909]. A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action. . . . It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but where an entirely new and different factual situation is presented, a new and different cause of action is stated. . . .' " (Citations omitted.) *Sharp* v. *Mitchell,* supra, 71–72, quoting *Gallo* v. *G. Fox & Co.,* 148 Conn. 327, 330, 170 A.2d 724 (1961).

We have previously recognized that our relation back doctrine "is akin to rule 15 (c) of the Federal Rules of Civil Procedure, which provides in pertinent part: '(c) RELATION BACK OF AMENDMENTS. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.' " *Giglio* v. *Connecticut Light & Power Co.,* supra, 239–40; see also *Sharp* v. *Mitchell,* supra, 72. The policy behind rule 15 (c) is that a party, once notified of litigation based upon a particular transaction or occurrence, has been provided with all the notice that statutes of limitations are intended to afford. 3 J. Moore, Federal Practice (2d Ed.) ¶ 15.15 [3]; see *Sharp* v. *Mitchell,* supra; *Giglio* v. *Connecticut Light & Power Co.,* supra, 240. Because rule 15 provides that an amendment relates back where the original complaint has

given the party fair notice that a claim is being asserted stemming from a particular transaction or occurrence, the objectives of our statute of limitations, namely, to protect parties from having to defend against stale claims, is fully served. C. Wright, Law of Federal Courts (2d Ed. 1970) p. 276; *Sharp* v. *Michell,* supra; *Giglio* v. *Connecticut Light & Power Co.,* supra.

Mayer argues that "the change of focus from actions within the scope of employment to actions outside the scope of employment is of such a magnitude as to preclude a relation back for statute of limitations purposes." In support of this assertion, Mayer primarily relies on *Sharp* v. *Mitchell,* supra.

In *Sharp* v. *Mitchell,* supra, 72–73, the plaintiffs, in their first complaint, brought a wrongful death action against the defendant based on negligent supervision.[10] The plaintiffs subsequently amended the complaint to allege that the defendant had negligently designed and constructed the underground storage area where their decedents suffocated. Id., 73. The court held that "[t]hese complaints involve two different sets of circumstances and depend on different facts to prove or disprove the allegations of a different basis of liability. . . . The defendants did not have fair notice of the claim of negligent construction and design of the underground storage area when the original complaint merely alleged that [the defendant] was negligent in ordering the employees to enter the area." Id.

The amendment that occurred in this case is distinguishable from that in *Sharp* v. *Mitchell,* supra. In

---

[10] The plaintiffs claimed, more specifically, that the defendant "intentionally and/or negligently caused the death of the plaintiffs' decedents by ordering them to enter an underground area, which [the defendant] knew to be without adequate ventilation, contained toxic fumes, lacked oxygen, and lacked proper lighting, gauges and other safety equipment." *Sharp* v. *Mitchell,* 209 Conn. 59, 73, 546 A.2d 846 (1988).

*Sharp*, the change in the nature of the negligence action from one of negligent supervision to one of negligent construction was dramatic because the defendant would have been required to gather different facts, evidence and witnesses to defend the amended claim. In this case, however, the plaintiff's amendment reiterated the negligence claim based on Mayer's operation of a motor vehicle, but added that Mayer was acting either wilfully, wantonly, and maliciously or outside the scope of his employment. The new allegations did not inject "two different sets of circumstances and depend on different facts"; *Sharp* v. *Mitchell,* supra, 73; but rather amplified and expanded upon the previous allegations by setting forth alternate theories of liability. The fact that the new allegations had the potential effect of taking the claim outside the operation of the fellow employee immunity rule does not negate "the identity of the cause of action." *Gallo* v. *G. Fox & Co.,* supra. Mayer had adequate notice that a claim was being asserted against him arising out of the alleged motor vehicle accident.

## C

We now turn to Mayer's claim that the court improperly instructed the jury that, in order for the jury to determine that Mayer was acting in the scope of his employment at the time of the alleged accident, it had to find that he was: (1) "in fact actively engaged in some service for his employer, the Stamford Police Department"; and (2) capable of being so engaged.[11] Mayer

[11] The trial court instructed the jury, on the second count of the complaint, as follows: "The second count alleges that the defendant was negligent in causing the claimed accident and the resulting injuries. Negligence does not involve an intent on the part of the defendant to injure the plaintiff but rather only a finding that, while operating this motor vehicle in this Glenbrook Road, Ely Place area, the defendant failed to act with due and reasonable care under all the circumstances. Failed to act with due and reasonable care. Before, however, we reach the question of negligence,

argues that the trial court improperly imposed a "capability" requirement on the issue of whether one is engaged in the scope of his employment. We agree.

The plaintiff was required to prove that Mayer was acting outside the scope of his employment[12] in order to avoid the operation of the fellow employee immu-

we have to take up the issue of whether or not the defendant was engaged within the scope of his employment at the time of the incident referred to in the complaint. . . . We ask you, pose to you, this question of whether or not you believe the defendant was or was not engaged within the scope of his employment at the time of this incident. So the question of his alleged negligence need not be addressed until and unless you first decide that the defendant was not acting or engaged within the scope of his employment at the time of the alleged collision and resulting injuries to the plaintiff as this, too, represents an exception to the general rule that one fellow or co-employee may not sue another.

"All right. Now, what does acting within or being engaged in the scope of one's employment mean? It does not refer simply to being on duty, but rather it refers to an employee engaging in the immediate and actual performance of a public duty imposed by law at the time of the incident in question. Engaging in—to repeat—the immediate and actual performance of a public duty imposed by law at the time of the incident in question. If the defendant was *capable of being so engaged and was in fact so engaged* then the plaintiff is not entitled to recover on this, the second count of her complaint. If, on the other hand, the defendant *was not capable of being engaged in the immediate and actual performance of a public duty imposed by law at that time and place or that he was not in fact so engaged,* then the plaintiff is entitled to recover.

"To put it in a slightly different fashion, the question for you to decide is whether *the defendant was both capable of and in fact actively engaged in some service for his employer,* the Stamford Police Department. Was he acting, that is, in the course of his employment? Now, as you know, the defendant claims he was actively engaged in the surveillance of a gold Cadillac being operated by a known criminal. *Was he capable or incapable of being so engaged?* Or, on the other hand, was he simply driving home after a social evening or to some other social location? If you conclude that the defendant was not capable of being engaged in or was not, in fact, engaged in the scope of his employment at that time and place, you would then go on to answer question four in our interrogatories which pertains to this concept of negligence." (Emphasis added.)

[12] Although the plaintiff also claimed that Mayer acted wilfully and wantonly; see General Statutes § 7-465; the jury specifically rejected that claim in a response to an interrogatory. Therefore, that issue is not before us on this appeal.

nity rule of § 7-465.[13] The challenged instruction cannot be considered, however, solely as it relates to the fellow employee immunity rule. Indeed, besides the fellow employee immunity rule, § 7-465 also uses the term, "scope of employment," regarding workers' compensation and indemnification for municipal employees. Therefore, because we do not ordinarily read the same term as having different meanings within the same statute; *In re Juvenile Appeal (85-AB),* 195 Conn. 303, 324, 488 A.2d 778 (1985); the propriety of the imposition of a "capability" prong on the determination of whether one is engaged in the "scope of employment" for the purposes of evaluating a claim pursuant to the fellow employee immunity rule will likewise affect the evaluation of whether an employee can be indemnified by the municipality or recover workers' compensation for injuries.[14]

Mayer does not challenge the first prong of the instruction, requiring the jury to find that he "was

[13] The trial court properly noted that the 1985 amendment to General Statutes § 7-465; Public Acts 1985, No. 85-521, § 1; which allowed suits between fellow employees where the action is based on "the fellow employee's negligence in the operation of a motor vehicle," constituted a substantive amendment that could not be retroactively applied. Because the plaintiff's alleged accident occurred on September 2, 1983, the motor vehicle exception was inapplicable.

[14] The test of "scope of employment" as applied by the trial court to include a "capability" element will impact on municipal indemnification. General Statutes (Rev. to 1983) § 7-465 provides that the municipality will indemnify a municipal employee for "all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was . . . within *the scope of his employment,* and . . . not the result of any wilful or wanton act of such employee in the discharge of such duty." (Emphasis added.) Additionally, the test of "scope of employment" as applied by the trial court to include a "capability" element will impact on the duty of a municipality to provide workers' compensation benefits for municipal employees. General Statutes § 7-465 specifically refers to the Workers' Compensation Act, chapter 568, as applying in suits between fellow employees engaged "in *the scope of their employment* for such municipality." (Emphasis added.)

engaged in the immediate and actual performance of a public duty imposed by law." Mayer does challenge the applicability of the second prong, requiring that the jury also find that he was "capable" of being so engaged. This language appears to have been drawn from 1A A. Larson, Workmen's Compensation Law § 34, entitled "INTOXICATION." Section 34 provides, in relevant part, that "[v]oluntary intoxication which renders an employee incapable of performing his work is a departure from the course of employment." While Larson's statement of the law initially appears to support the two-prong instruction given to the jury, a closer reading demonstrates that it is merely a broad introductory principle later narrowed in the chapter.

Larson's discussion simply notes that capability to engage in one's employment is an element to be considered in determining whether an employee has, by virtue of his voluntary intoxication, abandoned his employment. 1A A. Larson, supra, § 34.21. Considering an employee's capability in this limited context does not require, however, that capability to engage must be shown in order for a jury to find that an employee acted within the scope of his employment. Furthermore, the cases cited by Larson indicate that the intoxication of an employee at the time he suffers his injury is merely one consideration in the determination of whether the injury occurred during the course of his employment,[15] and is not an additional analytical requirement. See, e.g., *Embree* v. *Industrial Commis-*

---

[15] Traditionally, the issue of intoxication arises where an employer denies workers' compensation benefits to an employee or his representative by claiming that the injury occurred because the employee was intoxicated. See generally 1A A. Larson, Workmen's Compensation Law § 34.21. In this case, although Mayer did not claim workers' compensation, the "scope of employment" test is nonetheless applicable because the plaintiff attempted to prove that Mayer's intoxication rendered him outside that scope.

*sion,* 21 Ariz. App. 411, 413, 520 P.2d 324 (1974) (test of whether employee was capable of properly performing his duties based upon intoxication was too stringent); *County of Cook* v. *Industrial Commission,* 177 Ill. App. 3d 264, 270, 532 N.E.2d 280 (1988) ("even if an employee's intoxicated condition is a contributing cause of his injury, if the employee is not incapacitated from following his occupation, his recovery of compensation will not be defeated"); *Steffes* v. *93 Leasing Co.,* 177 Mont. 83, 90–91, 580 P.2d 450 (1978) (claim that the plaintiff was so intoxicated that he was incapable of performing rejected where the plaintiff was still acting within scope of employment).

Larson's discussion and these cases indicate that an employee's intoxication will not render his conduct outside the scope of employment unless his intoxication is so severe that it incapacitates him from performing his work, as opposed to performing it in an improper manner.[16] Whether the intoxication has reached that level is, of course, a factual question in any given case. Before that question is submitted to the jury, however, the trial court must be satisfied that there is sufficient evidence for such a factual finding. We leave those determinations in this case to the court and jury upon the remand.

An examination of the challenged instruction in other contexts buttresses our conclusion that the intent of the legislature was not to impose a separate capability test under General Statutes § 7-465. The instruction effectively could decrease the level of responsibility imposed on municipalities under § 7-465, because a

---

[16] General Statutes § 31-284 (a) provides that an employer will not be required to pay compensation where "the personal injury has been caused by the wilful and serious misconduct of the injured employee or by his intoxication." That statute cannot reasonably be read, however, to require the two-prong capability test employed by the trial court in this case.

municipality arguably would be able to escape indemnification or workers' compensation liability payments by claiming that the employee was "incapable" of performing despite the fact that the employee was otherwise acting within the scope of his employment.

An assertion of employee "incapability" would not be limited to a claim of intoxication. A municipality could defend an indemnification claim by an injured third party by claiming that a municipal employee, who had not slept in eighteen hours, was thereby incapable of driving, despite the fact that the employee was otherwise acting in the course of the municipality's business. Also, a municipality could seek to avoid a workers' compensation claim by claiming that the employee, who lacked the physical strength to perform a certain task, was incapable of performing and, therefore, not within the scope of his employment. We do not believe that § 7-465 contemplates scenarios such as these, and we decline to interpret it so as to permit them.

The plaintiff argues that, even if the instruction was improper, any error was harmless. The plaintiff asserts that the instruction placed a higher burden of proof upon her because she was required to prove not only that the defendant was acting outside the scope of his employment, but also that he was incapable of so acting. On the contrary, the "capability" prong provided the plaintiff with an alternative method of taking her claim outside the operation of the fellow employee immunity rule based upon the defendant's consumption of alcohol. The plaintiff's burden was reduced by the instruction because the jury could have determined that the defendant was incapable of performing police work because he had been drinking, despite the fact that it may have also found that he actually was engaged in surveillance at the time of the alleged accident. Thus, the trial court's instruction improperly

decreased the plaintiff's burden of proof. This improper instruction went to the heart of the case, and requires a new trial.

## D

We next address Mayer's claim that the trial court improperly excluded evidence of the plaintiff's continued receipt of full pay since the date of the alleged accident.[17] Mayer offered the evidence for the limited purpose of showing that the plaintiff's absence from work was not the result of disability but that the plaintiff was a malingerer who was motivated by her financial situation to remain out of work. The court ruled that it had no discretion to permit the evidence because of the collateral source rule. We agree with Mayer that the collateral source rule did not foreclose a discretionary ruling on the proffered evidence. We leave the exercise of that discretion to the trial court on the remand.

Pursuant to a collective bargaining agreement with the Stamford police department,[18] the plaintiff had been receiving her full salary and benefits since the date of the alleged accident. During that time, the plaintiff treated that salary as tax free income,[19] thereby receiving increased earnings because no taxes were deducted. During trial, Mayer attempted to impeach the plaintiff's credibility and to establish that she had a motive

---

[17] Although we have determined that a new trial is necessary, we consider this claim because it is likely to arise on the retrial.

[18] See Part III A, infra, where we conclude that the collective bargaining agreement provided the plaintiff with two thirds of her salary as temporary total disability compensation and the remaining one third as contractual excess.

[19] For purposes of this claim, the true tax ramifications of the plaintiff's salary payments are irrelevant. Because of the manner in which she treated the income for tax purposes, however, the evidence was relevant because it demonstrated that the plaintiff was receiving more net income from the collective bargaining agreement than she would have received had she been working.

for remaining out of work for the five year period by showing that she was receiving more money by not working than she had earned while actively employed.

The trial court sustained the plaintiff's objection to the evidence. The court believed that it had no discretion to determine whether to allow the evidence because the collateral source rule was an absolute bar to its admission.[20]

The collateral source rule provides that " 'a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him.' *Lashin* v. *Corcoran,* 146 Conn. 512,

---

[20] The trial court stated that it is the "[s]tate of the law then that it can't be introduced whether it's statute or case law." Later, the court added that "it seems to me that if a person has missed time at work and is telling the jury about that they missed time at work, the fact that they have been paid for it cannot be admitted into evidence because of the collateral source rule and that doesn't change because (a) the person is not being penalized by only getting 70% of their salary nor does it change by (b) the fact that the person hasn't returned to work because of some kind of motivational theory that you're putting forth." Finally, after the parties researched the issue, the court stated that "I don't see—let me put it this way—none of the Connecticut cases that I saw substantial—I'm not saying that there might be cases in other jurisdiction—but I found nothing in our Connecticut cases and in my mind it was fortified by the fact that, under our new tort reform act, we have specific statutes . . . . Specific statutes talking about collateral sources and defining them."

Mayer argued that "I'm not asking the collateral source rule be changed for purposes of getting credits and that's what the whole idea of the collateral source rule is. I am suggesting that the collateral source rule a rule of evidence, that the question of motivation and the like is a very material and relevant issue but that it is a public policy that usually keeps out collateral sources. Now we are dealing with balancing the probative value of evidence going to motive and the like against the perceived public policy interest that's encompassed in the collateral source rule. It's not a question of doing away with the collateral source rule." Although the court replied that "I've done all the balancing that I can," the entire discussion demonstrates that the court did not believe, absent specific Connecticut authority, that it had the discretion to allow the offered evidence.

515, 152 A.2d 639 (1959) . . . ." (Citation omitted.) *Rametta* v. *Stella,* 214 Conn. 484, 489, 572 A.2d 978 (1990). " 'The basis of our well-established collateral source rule is that a wrongdoer shall not benefit from a windfall from an outside source. That rule is applicable . . . in any tort case.' *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 101–102, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663 (1972)." Id., 489–90. We have not addressed, however, whether evidence that a plaintiff has received income from a collateral source is nonetheless admissible for the purpose of showing the plaintiff's malingering where there is other corroborative evidence of malingering.[21]

We do not decide whether under the facts of this case the evidence in question should have been admitted. That determination is to be made by the trial court on remand, after exercising its discretionary function of weighing the probative value of the evidence against its potential prejudicial effect. Nor do we decide the full scope of exceptions to the collateral source rule.

Our sole concern here is whether the trial court had the discretion to permit Mayer to introduce evidence that the plaintiff continued to receive her full salary and benefits for the period preceding trial, where Mayer introduced corroborative evidence that the plaintiff had not attempted to find other employment or to pursue occupational rehabilitation or special placement, and that the plaintiff was performing activities alleged to have been beyond her capabilities, as demonstrated by a videotape. We conclude that the trial court did have that discretion, and that the court's failure to exercise that discretion was improper. See *State* v. *Martin,* 201 Conn. 74, 88, 513 A.2d 116 (1986).[22]

---

[21] We note that our statutes concerning the collateral source rule; General Statutes §§ 52-225a through 52-225c; do not address this issue.

[22] Other jurisdictions have applied different standards in dealing with exceptions to the collateral source rule. See generally comment, "A Sur-

We conclude that on the facts of this case the proper standard for the "malingering" exception to the collateral source rule is that applied by the Massachusetts courts.[23] See *Corsetti* v. *Stone Co.,* 396 Mass. 1, 16–18, 483 N.E.2d 793 (1985); *McElwain* v. *Capotosto,* 332 Mass. 1, 2–3, 122 N.E.2d 901 (1954). That standard gives the trial court discretion to admit evidence of collateral income in order to show malingering if there is corroborative evidence and a proper limiting instruction is given. Therefore, the trial court should have exercised its discretion, based upon the corroborative

vey of the Collateral Source Rule: The Effects of Tort Reform and Impact on Multistate Litigation," 53 J. Air L. & Com. 799 (1988). Some states have adopted a rule of per se inadmissibility of collateral source evidence. See *Foster* v. *Harmon,* 145 Ga. App. 413, 414, 243 S.E.2d 659 (1978). Other states provide that the trial court, in its discretion, may admit evidence of collateral income to show malingering so long as there is corroborative evidence and a limiting instruction is given. See *Corsetti* v. *Stone Co.,* 396 Mass. 1, 16–18, 483 N.E.2d 793 (1985). Still other states permit the trial court to admit evidence of collateral income where the defendant has presented other evidence of malingering and where a limiting instruction is given, provided that the evidence has *substantial* probative value to corroborate the claim. *Hrnjak* v. *Graymar, Inc.,* 4 Cal. 3d 725, 732, 484 P.2d 599, 94 Cal. Rptr. 623 (1971).

[23] The plaintiff's reliance on *Eichel* v. *New York R. Co.,* 375 U.S. 253, 84 S. Ct. 316, 11 L. Ed. 2d 307 (1963), is misplaced. In *Eichel,* the majority of the United States Supreme Court held that it was proper for the trial court to refuse to allow evidence of receipt of a disability pension under the Railroad Retirement Act for the purpose of showing a motive for not returning to work. Id., 255–56. The court stated that "the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. Moreover, *it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act of 1937,* 50 Stat. 309, as amended, 45 U.S.C. § 228b (a) 4, *were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act.*" (Emphasis added.) Id., 255. *Eichel* has been limited, however, to the federal statutory scheme of the Railroad Retirement Act. See *DeMedeiros* v. *Koehring Co.,* 709 F.2d 734, 741 (1st Cir. 1983) ("[i]n diversity negligence cases, this circuit has refused to extend the holding in *Eichel* beyond its federal statutory context").

evidence presented, to determine whether the probative value of the proffered evidence outweighed its prejudicial effect. See *Corsetti* v. *Stone Co.*, supra, 17. Additionally, if the trial court on remand determines that the collateral income evidence is admissible, it should provide a limiting instruction to the jury not to consider the collateral income evidence in its calculation of any damages to be awarded to the plaintiff. Id., 21.

## E

Mayer finally claims that the trial court improperly refused to allow follow-up questions of a witness, Officer Robert Harrington, after the jury was permitted to submit questions to him pursuant to an experimental program. We disagree.

Harrington, an equipment mechanic with the Stamford police department, examined the vehicles of the plaintiff and Mayer the day after the alleged accident occurred, and testified that he saw no damage to either vehicle. Following his cross-examination, the court asked Harrington two questions that had been submitted by the jury: (1) "In the incident how did it get to the police garage by 9 a.m. that morning?" Harrington answered "I don't know"; and (2) "Could a car traveling at ten miles an hour be hit by one going fifteen miles an hour or possibly a little faster and not show any visible damage because they were both heading in the same direction?" Harrington answered "[t]hat I really couldn't say." The court refused Mayer's request for follow-up questions. Mayer excepted to this ruling.

The trial court implemented a procedure whereby jurors, at the completion of examination by counsel, were permitted to retire to the jury room in order to formulate questions for submission to the witnesses by

the court. The court reviewed the questions with counsel outside the presence of the jury, and, if there were no objections, asked the questions of the witness. We have recently held that the trial court, in its discretion, may properly implement this procedure. See *Spitzer* v. *Haimes & Co.*, 217 Conn 532, 549, 587 A.2d 105 (1991). Contrary to the facts in *Spitzer*, where a standing objection to the procedure was placed upon the record; id., 537–38; in this trial the parties assented to the procedure of jurors asking questions. On appeal, Mayer claims only that the court improperly refused to allow him to ask a follow-up question of Harrington.[24]

The trial court had instructed counsel that they would be permitted to ask follow-up questions of the witnesses after the questions by the jurors were answered. Because Harrington was a witness for Mayer, such follow-up questions would have constituted, in effect, redirect examination. "[A] witness is permitted on redirect examination to explain or clarify any relevant matters in his testimony which may have been weakened or obscured by his cross-examination." *State* v. *Conrod*, 198 Conn. 592, 596, 504 A.2d 494 (1986). Furthermore, "[t]he extent and scope of redirect examination . . . may be limited within the discretion of the trial judge." Id.

---

[24] Although Mayer excepted to the ruling of the trial court, he failed to make an offer of proof. Therefore, Mayer's claim that his questions on redirect were to "emphasize the practical, as opposed to theoretical, knowledge of the witness" is unsupported by the record. Generally, we will not review a claim absent an offer of proof as to the purpose or content of the testimony that the party sought to introduce; *State* v. *Conrod*, 198 Conn. 592, 597, 504 A.2d 494 (1986); *Jacobsen* v. *Jacobsen*, 177 Conn. 259, 267, 413 A.2d 854 (1979); because, absent an indication of that purpose or content, there is an inadequate record to rule on the claim. *State* v. *Conrod*, supra. Furthermore, ordinarily we would not consider a claim on appeal that is not likely to arise on a retrial that, as in this case, we have already ordered on other grounds. In this instance, however, we will review Mayer's claim in order to clarify the law in this developing area of juror questioning.

In this case, the trial court did not abuse its discretion in refusing to allow redirect examination on the questions posed by the jurors because Harrington had already stated that he did not know the answers to them. It was reasonable, therefore, for the court to conclude that Harrington would be unable to provide relevant information on redirect or to clarify his testimony. See *State* v. *Conrod,* supra.

## II

### LOUIS GURLIACCI'S CROSS APPEAL

In his cross appeal, Louis Gurliacci claims that the trial court improperly granted Mayer's motion for summary judgment regarding his claim of loss of consortium. The facts concerning this claim are undisputed. In October, 1981, the plaintiff and Louis Gurliacci became engaged to be married, and in February, 1982, they began to cohabit. On February 2, 1983, the alleged accident occurred. On September 2, 1983, they were married and remain married. Louis Gurliacci claims that the trial court improperly granted Mayer's motion for summary judgment because "[n]o Connecticut case on point exists as to [the] proposition that a husband's entire claim for loss of consortium is defeated simply because his marriage to the injured party occurs after the injury."[25] We disagree.

"Our standard of review of a trial court's decision to grant a motion for summary judgment is well estab-

---

[25] Louis Gurliacci also argues that denial of his loss of consortium claim would be: (1) "making an arbitrary distinction between those parties married before and after an injury"; (2) infringing on his constitutional rights of privacy pursuant to the fifth and fourteenth amendments to the United States Constitution and article first, § 20, of the Connecticut constitution; and (3) impairing his "fundamental right to recover damages for injuries from tortious acts" pursuant to article first, § 10, of the Connecticut constitution. These claims are meritless. He offers neither authority nor reasoning in support of such purported constitutional deprivations, nor have we been able to discover or discern any.

lished. Practice Book § 384 provides that summary judgment 'shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 402, 528 A.2d 805 (1987); see also *Connell* v. *Colwell,* 214 Conn. 242, 246, 571 A.2d 116 (1990). The issue, therefore, is whether the trial court properly determined that judgment for Mayer was required as a matter of law because Louis Gurliacci was not married to the plaintiff at the time of the actionable injury to the plaintiff. *Zichichi* v. *Middlesex Memorial Hospital,* supra.

In *Hopson* v. *St. Mary's Hospital,* 176 Conn. 485, 493, 408 A.2d 260 (1979), this court abolished the rule set forth in *Marri* v. *Stamford Street R. Co.,* 84 Conn. 9, 78 A. 582 (1911), that disallowed a *married* person whose *spouse* had been injured from bringing a claim for loss of consortium. The court in *Hopson* defined "consortium" as "encompassing the services of the *wife,* the financial support of the *husband,* and the variety of intangible relations which exist *between spouses living together in marriage.*" (Emphasis added.) *Hopson* v. *St. Mary's Hospital,* supra, 487. The "intangible" factors have been defined as " 'constellation of companionship, dependence, reliance, affection, sharing and aid *which are legally recognizable, protected rights arising out of the civil contract of marriage.*' " (Emphasis added.) Id. We concluded that "[s]*hould the victim be married,* it follows that the *spouse* may suffer personal and compensable, though not physical, injuries as a direct result of the defendant's negligence and that such injuries should not go uncompensated." (Emphasis added.) Id., 493.

The language and reasoning in *Hopson* focus on the marital relationship as it existed on the date of the

injury. There is no indication in *Hopson* or later Connecticut decisions[26] to support Louis Gurliacci's claim that a person who is not married to the victim of the tort at the time of the injury may, upon marriage, bring a claim for loss of consortium. To the contrary, the language of *Hopson,* providing that "should the victim be *married";* (emphasis added) id.; implicitly limits such actions to situations where the victim was married at the time of the alleged incident.

Furthermore, virtually all of the jurisdictions that have considered the question[27] take the position that

[26] See, e.g., *Champagne* v. *Raybestos-Manhattan, Inc.,* 212 Conn. 509, 553, 562 A.2d 1100 (1989) ("[t]he term 'consortium' is usually defined as encompassing the services and/or the financial support of a spouse, 'and the variety of intangible relations which exist between spouses living together in marriage' "); *Izzo* v. *Colonial Penn Ins. Co.,* 203 Conn. 305, 312, 524 A.2d 641 (1987) ("[l]oss of consortium, although a separate cause of action, is not truly independent, but rather derivative and inextricably attached to the claim of the injured spouse"); *Ladd* v. *Douglas Trucking Co.,* 203 Conn. 187, 189, 523 A.2d 1301 (1987) (" 'an injury to one's spouse may turn a happily married man or woman into a life-long nurse and deprive him or her of an opportunity of having children or raising a family' ").

[27] See, e.g., *Schroeder* v. *Boeing Commercial Airplane Co.,* 712 F. Sup. 39, 43 (D.N.J. 1989) ("[h]aving conducted an exhaustive discussion of state cases and New Jersey State law, we believe that the New Jersey Supreme Court will reassert the generally accepted principle that a valid marriage is a prerequisite to establish a claim for loss of consortium"); *Weaver* v. *G.D. Searle & Co.,* 558 F. Sup. 720, 724 (N.D. Ala. 1983) ("[i]n light of the legal history of the action for loss of consortium, the public policy in favor of ceremonial marriage, and the overwhelming, persuasive case authority from other jurisdictions, this Court concludes that a valid marriage at the time of injury is a necessary and indispensable element in any cause of action for loss of consortium in Alabama"); *Chiesa* v. *Rowe,* 486 F. Sup. 236, 238–39 (W.D. Mich. 1980) ("[w]hen a fiancee decides to go forward with the marriage after injury and disability strikes her betrothed she must recognize the extent of assistance and comfort that he will be able to provide and will in turn require . . . [i]n doing so she waives her rights to another level or form of conjugal fellowship which might have been obtained had she married another. In addition policy dictates that there be some limitation to this form of liability"); *Briggs* v. *Butterfield,* 104 App. Div. 2d 626, 479 N.Y.S.2d 758 (1984) ("in virtually every jurisdiction of the United States,

"[a]n action for loss of consortium cannot be maintained unless the plaintiff was married to the injured person at the time of the actionable conduct." *Briggs* v. *Butterfield,* 104 App. Div. 2d 626, 479 N.Y.S.2d 758 (1984).

The rationale behind this requirement is that "the formal marriage relation forms the necessary touchstone to determine the strength of commitment between the two individuals which gives rise to the existence of consortium between them in the first instance." *Schroeder* v. *Boeing Commercial Airplane Co.,* 712 F. Sup. 39, 41 (D.N.J. 1989) (applying the law of New Jersey).[28] We agree with this rationale, and conclude, consistent with our prior case law, that a cause of action for loss of consortium does not exist where the injury occurred prior to the marriage of the parties.

a lawful marriage at the time the claim arises is a prerequisite to recovery for loss of services"); *Miller* v. *Davis,* 107 Misc. 2d 343, 344, 433 N.Y.S.2d 974 (1980) (New York does not recognize a cause of action for loss of consortium where the injury to the spouse occurred prior to the marriage of the parties); *Haas* v. *Lewis,* 8 Ohio App. 3d 136, 137, 456 N.E.2d 512 (1982) ("the right of consortium, by its very definition, is a right which grows out of marriage, is incident to marriage, and cannot exist without marriage . . . [b]ecause it is a marital right, the right of consortium is not conferred upon partners to extramarital cohabitation"); *Denil* v. *Integrity Mutual Ins. Co.,* 135 Wis. 2d 373, 379, 401 N.W.2d 13 (1986) ("[i]f a loss of consortium claim were to be extended to include unmarried individuals, the certainty of who is entitled to prosecute such a claim is destroyed . . . [t]o compensate for such losses . . . would involve costs far beyond those society can afford. Public policy precludes broadening the scope of a consortium claim to encompass engaged individuals").

[28] Other reasons often stated in support of the requirement of an existing marital relationship at the time of the injury are: (1) an individual should not be permitted to marry a cause of action; *Wagner* v. *International Harvester Co.,* 455 F. Sup. 168, 169 (D. Minn. 1978); (2) an individual marries the person in her existing state of health, and thereby assumes the risk that the resulting injury will result in a deprivation; *Rademacher* v. *Torbensen,* 257 App. Div. 91, 13 N.Y.S.2d 124 (1939); and (3) liability for injury must be delineated at some point for public policy reasons. *Tong* v. *Jocson,* 76 Cal. App. 3d 603, 605, 142 Cal. Rptr. 726 (1977); see generally *Schroeder* v. *Boeing Commercial Airplane Co.,* 712 F. Sup. 39, 41–42 (D.N.J. 1989).

## III

### STAMFORD'S APPEAL

We turn now to the claims of the intervening plaintiff, Stamford, on its appeal, and to a related claim of the plaintiff, Debra Gurliacci, on her cross appeal.[29] Stamford claims that the trial court improperly: (1) concluded that the plaintiff was not required to reimburse Stamford for that portion of her salary which it claims was paid as temporary total disability because the court concluded that the plaintiff received her salary pursuant to a collective bargaining agreement that superseded the provisions of the Workers' Compensation Act; (2) applied General Statutes § 31-308 to its claim for reimbursement of a specific award; (3) apportioned the damage award pursuant to General Statutes § 31-293 (a); and (4) commingled the legal positions of Stamford and Mayer.[30] The plaintiff claims that Stamford waived any rights it had to recover any future specific award to her. We agree with Stamford as to its first and third claims, and we disagree with the plaintiff on her claim.

The relevant factual and procedural history of these issues is as follows. After the jury awarded the plaintiff $485,000 in damages, Stamford moved for apportionment in order to recover sums alleged to have been paid as workers' compensation benefits. In particular, Stamford sought reimbursement of: (1) medical expenses

---

[29] Although we are reversing and remanding the tort action, we address these claims of Stamford and the plaintiff, which primarily concern workers' compensation, because they may recur on the retrial. We discuss here the plaintiff's claim on her cross appeal because it is closely related to Stamford's claims on its appeal. In part IV, infra, we discuss the plaintiff's remaining cross appeal claims.

[30] We need not discuss Stamford's claim of commingling of legal positions in light of our conclusion that the trial court improperly apportioned the damages.

that it had paid to date; (2) temporary total disability payments allegedly made to the plaintiff as workers' compensation; (3) the present value of a specific award based upon an alleged 20 percent permanent partial disability to the plaintiff's back; and (4) the present value of any probable future payments.

With respect to Stamford's claims for reimbursement of medical expenses, the court awarded Stamford $18,741.38, less one third for the plaintiff's attorney's fees, and found that the city would not be responsible for any future medical bills. The court denied Stamford's claim for reimbursement of two thirds of the plaintiff's salary purportedly paid as temporary total disability benefits, finding that Stamford had paid the plaintiff her salary pursuant to a collective bargaining agreement and not pursuant to its workers' compensation obligations. Regarding Stamford's claim for the present value of a specific award based on a purported 20 percent permanent partial disability of the plaintiff's back, the court found that, because the plaintiff had not filed an application for a specific award, Stamford could not be reimbursed, but awarded Stamford a credit should the plaintiff ever make a claim for such specific benefits.

## A

Stamford first claims that the court improperly concluded that it was not entitled to reimbursement of two thirds of the plaintiff's salary under General Statutes § 31-293 (a)[31] because, in the court's view, the plaintiff was receiving her full salary solely pursuant to a collective bargaining agreement, and not as workers' compensation. We agree with Stamford.

Stamford's claim involves the question of whether the collective bargaining agreement, which provides

[31] See footnote 3, supra, for full text.

that all employees "are subject to the Workmen's Compensation Law of the State of Connecticut,"[32] was intended to provide police officers with two thirds of their salary as workers' compensation benefits for which they would be required to reimburse Stamford should they recover third party damages, and with one third of their salary as additional sick leave. In interpreting the collective bargaining agreement, the trial court focused primarily on the lack of any specific contractual language or practice demonstrating that two thirds of the salary represented workers' compensation benefits. Although contract interpretation is generally a question of fact for the trial court; *Bowman* v. *1477 Central Avenue Apartments, Inc.,* 203 Conn. 246, 257, 524 A.2d 610 (1987); the trial court's interpretation of this contract properly should have been informed by reference to the Workers' Compensation Act. By failing to consider the act, the trial court ignored the policy underlying § 31-293 (a) of our Workers' Compensation Act which prohibits double recovery.

The collective bargaining agreement provides that "all employees are subject to the Workmen's Compensation Law . . . ." This language necessarily implies that an employee is subject to all provisions of the Workers' Compensation Act, not solely to those provisions which benefit the employee. General Statutes § 31-293 (a) provides that an employer who has paid or who has become obligated to pay compensation under the Workers' Compensation Act may bring an action, or join an action brought by the employee,

---

[32] The collective bargaining agreement between Stamford and the Stamford police association provided, in pertinent part: "B. The City acknowledges that all employees are subject to the Workmen's Compensation Law of the State of Connecticut and are entitled to all benefits thereunder, including lump sum payments, except that in lieu of the limited weekly wage payments provided for by said law, employees shall receive the sick leave benefits in effect under the presently existing sick leave plan, while still on active duty. Sick leave shall be based on regular weekly salary."

against a third party to recover from an award of damages "any amount that he has paid or has become obligated to pay as [workers'] compensation to such injured employee." See footnote 3, supra. Under the act, Stamford, as the employer of the plaintiff, was obligated to pay two thirds of her salary as compensation. General Statutes § 31-307.[33] Therefore, because the language of the contract provides that the employees are subject to the Workers' Compensation Act, and because the act specifically provides that an employer who joins a third party action may recover sums paid as compensation from the damages awarded under that chapter, the trial court improperly determined that the terms of the collective bargaining agreement nullified the statutory reimbursement provision of § 31-293 (a).

Our conclusion that two thirds of the plaintiff's payments represented workers' compensation benefits is buttressed by Professor Larson, who, in addressing contractual supplements to compensation, states that where, for example, an employer agrees by contract to pay an employee $250 a week instead of the statutory amount of $200, "[o]ne cardinal principle . . . should ordinarily settle most such questions [that arise]. That principle is the simple proposition that the *contractual excess* is not workmen's compensation. It performs the same functions, and is payable under the same general conditions, but legally it is nothing more than the fruit of a private agreement to pay a sum of money on specified conditions." (Emphasis added.) 4 A. Larson, Workmen's Compensation Law § 97.53. Although this principle has not been universally accepted by other courts; compare *Evans* v. *Missouri*

---

[33] General Statutes § 31-307 provides in pertinent part: "If any injury for which compensation is provided under the provisions of this chapter results in total incapacity to work, there shall be paid to the injured employee a weekly compensation equal to sixty-six and two-thirds per cent of his average weekly earnings at the time of the injury . . . and such compensation shall not continue longer than the period of total incapacity."

*Utilities Co.,* 671 S.W.2d 812, 816 (Mo. App. 1984),[34] with *Gorski* v. *Kearny,* 236 N.J. Super. 213, 215, 565 A.2d 415 (1989);[35] we conclude that the only interpretation of the collective bargaining agreement that supports the underlying prohibition against double recovery in our Workers' Compensation Act is that propounded by Larson. We conclude, therefore, that only the amount in excess of the statutorily mandated temporary total disability payments necessarily was paid to the plaintiff pursuant to the collective bargaining agreement, and that Stamford will be entitled to reimbursement of two thirds of the plaintiff's salary as temporary total disability payments pursuant to § 31-293 (a), should the plaintiff recover a third party award on retrial. Such an interpretation affords proper deference to the language of the collective bargaining agreement referring to the provisions of the Workers' Compensation Act.[36]

---

[34] The Missouri Court of Appeals, in addressing whether a provision in a collective bargaining agreement providing that an injured employee would receive benefits greater than that provided by workers' compensation alone, stated that "[w]e believe that when the statute states that a credit is allowed when a payment is made on account of the injury it contemplates that the injury would be the only reason for the payment. That is not true here as the payment would not have been made were it not for the agreement. It took both the injury and the agreement to entitle plaintiff to the payment." *Evans* v. *Missouri Utilities Co.,* 671 S.W.2d 812, 816 (Mo. App. 1984).

[35] In *Gorski* v. *Kearny,* 236 N.J. Super. 213, 215, 565 A.2d 415 (1989), the Appellate Division of the New Jersey Superior Court addressed an analogous claim by an injured police officer who was receiving full salary pursuant to a collective bargaining agreement while on sick leave. The court held that "[a]lthough respondent was obligated under its collective bargaining agreement with petitioner's representative to pay full salary to an employee injured in a work related accident, respondent was also statutorily obligated, regardless of the terms of the collective bargaining agreement, to pay temporary disability benefits to an employee injured in the course of employment. Consequently, the only benefit petitioner received from the collective bargaining agreement was the portion of his salary which exceeded the temporary disability payments to which he was statutorily entitled." Id.

[36] The trial court based its conclusion that the entire salary was paid solely pursuant to the collective bargaining agreement in part on the contractual

This interpretation, preserving the employer's right to reimbursement of temporary total disability compensation pursuant to § 31-293 (a), advances the policy prohibiting double recovery. See generally J. Asselin, Connecticut Workers' Compensation Practice Manual (1985) p. 272. In this case, the trial court's interpretation of the collective bargaining agreement allowed the plaintiff such a recovery, namely, her full salary from Stamford and damages from the third party action, part of which represented lost wages. Our determination in this case conforms to our continued adherence to the policy prohibiting double recovery in our Workers' Compensation Act. See *Enquist* v. *General Datacom,* 218 Conn. 19, 26, 587 A.2d 1029 (1991) ("[o]ne of the purposes of the workers' compensation statute is 'the avoidance of two independent compensations for the injury' "); *Paternostro* v. *Edward Coon Co.,* 217 Conn. 42, 47–49, 583 A.2d 1293 (1991) (double compensation not allowed under workers' compensation).

Although we conclude that Stamford may be entitled to recover temporary total disability payments, should

language stating that "in lieu of the limited weekly wage limitations provided for by said law" employees would receive their full benefits. The court interpreted this language in isolation from the remainder of that contract section which provides that "all employees are subject to the Workmen's Compensation Laws . . . ." When considering both sentences, together with the strong policy against double recovery by employees, it is apparent that the language "in lieu of" was meant to indicate only that the employees would be entitled to the extra one third salary not provided for pursuant to General Statutes § 31-307 of the act.

The court also relied on the facts that: (1) the checks sent to the plaintiff were drawn from the police department budget rather than from a separate workers' compensation fund, and were identical to checks sent to other police officers, not indicating that two thirds represented workers' compensation payments; (2) Stamford deducted a full federal income tax deduction from the checks; and (3) the W-2 form that it provided did not reflect that any amount was workers' compensation. Although these facts, considered in isolation of the Workers' Compensation Act, may have justified the conclusion reached by the trial court, such a determination, when considered in conjunction with the policy prohibiting double recovery, is unsupportable.

the plaintiff recover damages from Mayer on retrial, we note that the workers' compensation commission has not made a determination of when, or whether, the plaintiff has reached maximum medical improvement such that she was no longer entitled to receive temporary total disability; General Statutes § 31-307; and such that she may have been entitled to receive a specific award.[37] The parties disputed the date on which the plaintiff reached maximum medical improvement,[38] a determination that is relevant to calculating the number of reimbursable weeks of temporary total disability compensation paid by Stamford. General Statutes § 31-307. We conclude that such a determination is properly made by the workers' compensation commission. Although § 31-293 (a) does not explicitly provide that such a determination must be made by the commissioner, we conclude that, where there is no agreement on the date of maximum medical improvement, the act implicitly delegates such responsibility to the commissioner. See *Love* v. *J. P. Stevens & Co.*, 218 Conn. 46, 50, 587 A.2d 1042 (1991) (Workers' Compensation Act delegates responsibility to commissioner to calculate credit for unknown future benefits).

## B

Stamford next claims that the trial court incorrectly applied General Statutes § 31-308[39] to its claim for

---

[37] "Generally, temporary incapacity benefits are payable only until the injured employee has reached maximum medical improvement. Once maximum improvement is reached, a permanent award becomes due, if warranted, and temporary benefits should cease." J. Asselin, Connecticut Worker's Compensation Practice Manual (1985) p. 118.

[38] Stamford argues that the evidence at trial established that the plaintiff reached maximum medical improvement on March 10, 1988, and the plaintiff argues that the evidence indicated that she reached maximum medical improvement on August 6, 1986.

[39] General Statutes § 31-308 provides in pertinent part: "COMPENSATION FOR PARTIAL INCAPACITY. (a) If any injury for which compensation is provided under the provisions of this chapter results in partial incapacity, there

reimbursement of the present value of a potential specific award for partial permanent injury to her back. The plaintiff claims on her cross appeal that, because there has been neither a demand for a specific award nor a finding relative thereto by the commission and because Stamford offered no evidence at trial as to the present value of the award, Stamford has waived its rights to recover any specific award. We disagree with the claims of both Stamford and the plaintiff.

shall be paid to the injured employee a weekly compensation equal to sixty-six and two-thirds per cent of the difference between the wages currently earned by an employee in a position comparable to the position held by such injured employee prior to his injury and the amount he is able to earn after such injury, except that when (1) the physician attending an injured employee certifies that such employee is unable to perform his usual work but is able to perform other work, (2) such employee is ready and willing to perform such other work in the same locality and (3) no such other work is available, such employee shall be paid his full weekly compensation subject to the provisions of this section. In either of the above cases, such compensation shall in no case be more than the maximum weekly benefit rate set forth in section 31-309 and shall continue during the period of partial incapacity but no longer than seven hundred and eighty weeks. If the employer procures for an injured employee employment suitable to his capacity, the wages offered in such employment shall be taken as the earning capacity of the injured employee during the period of such employment.

"(b) With respect to the following-described injuries the compensation, in addition to the usual compensation for total incapacity but in lieu of all other payments for compensation, shall be sixty-six and two-thirds per cent of the average weekly earnings of the injured employee, but in no case more than the maximum weekly benefit rate set forth in section 31-309, or less than fifty dollars weekly . . . (13) for the loss of the use of the back, that number of weeks which the proportion of incapacity represents to the maximum of five hundred and twenty weeks. If the injury consists of the loss of a substantial part of a member resulting in a permanent partial loss of the use of a member, or if the injury results in a permanent partial loss of function, the commissioner may, in his discretion, in lieu of other compensation, award to the injured person such a proportion of the sum herein provided for the total loss of, or the loss of the use of, such member or for incapacity or both as represents the proportion of total loss or loss of use found to exist, and any voluntary agreement submitted in which the basis of settlement is such proportionate payment may, if otherwise conformable to the provisions of this chapter, be approved by the commissioner in his discretion."

It is uncontroverted that the plaintiff has never made a claim for a specific award. The trial court, on that basis, concluded that "any specific 'award' granted in the future should belong to the City less attorneys' fees,"[40] thereby providing Stamford with a credit should a specific award be granted by the commissioner in the future.

Under § 31-293 (a), an employer's claim, after the employee has recovered damages from a third party, consists of: "(1) the amount of any compensation which he has paid on account of the injury which is the subject of the suit and (2) an amount equal to the present worth of any *probable future payments which he has by award* become obligated to pay on account of such injury." (Emphasis added.) We recently have held, in interpreting § 31-293, that "the employer [has] the right to immediate reimbursement for the present worth of future compensation payments to the extent that the future payments *were known and formalized by a commissioner's 'award' prior to the disposition of the third party action."* (Emphasis added.) *Enquist* v. *General Datacom,* supra, 24.

In this case, the amount of a specific award to the plaintiff, should she choose to seek one, is unknown. Furthermore, it is the province of the workers' compensation commission to determine whether such an award is proper. *Cleveland* v. *U.S. Printing Ink, Inc.,* 218 Conn. 181, 186, 588 A.2d 194 (1991) ("a future claim for specific benefits would require a separate proceeding before the commissioner"). As provided by one

---

[40] We discuss, infra, the trial court's incorrect method of apportionment under General Statutes § 31-293, whereby it deducted from reimbursements to Stamford of medical payments one third of that sum for the plaintiff's attorneys' fees. Although the parties have not specifically raised the issue in this appeal, we note that insofar as the trial court's award of a credit for any specific award in the future also ordered a deduction of one third for contribution to the plaintiff's attorneys' fees, it was incorrect.

Connecticut commentator, "[o]nce the medical decision has been made that the claimant has reached maximum medical improvement, the commissioner then has the discretion to decide whether . . . a specific indemnity award is due." J. Asselin, supra, p. 152. Therefore, because there had been neither a claim for a specific award nor a determination by the workers' compensation commission, the trial court correctly refused to reimburse Stamford for the present value of a specific award pursuant to § 31-293 (a).

The plaintiff also claims, however, that "[t]he City has waived its rights as to any recovery of the specific award" because it had the opportunity to present evidence at trial as to the present value of the future specific award and failed to do so. This claim is meritless because no request for a specific award has been filed with the commissioner and no award has been made. Therefore, Stamford had no evidence of present value to present to the trial court, and has not waived its rights to receive a credit should the plaintiff recover an award from Mayer on retrial. See *Enquist* v. *General Datacom,* supra, 26.

C

Stamford next claims that the trial court improperly failed to follow the statutory method of apportionment provided by § 31-293 (a). We agree.

Pursuant to Stamford's motion for apportionment, the trial court allowed reimbursement "with respect to medical, hospital and related bills in the amount of $18,741.38,[41] *less one-third thereof for the plaintiff's attorneys' fees.* " (Emphasis added.) Stamford argues that the trial court improperly deducted one third of the medical bill reimbursement for the plaintiff's attor-

[41] The Stamford administrators of its workers' compensation plan paid medical bills for the plaintiff in the sum of $18,741.38.

neys' fees. The plaintiff claims only that the court "intended that the City, which has received the benefit of the Plaintiff's attorney's efforts, should be required to defray part of that cost." The plaintiff cites no authority to support the method of apportionment implemented by the trial court, nor does she argue that it is consistent with § 31-293 (a). Rather, she appears to claim that such a policy determination of contribution to the plaintiff's attorneys' fees was within the trial court's discretion. We disagree.

Section 31-293 (a) provides, in pertinent part, that "[i]f such employer and employee join as parties plaintiff in such action and any damages are recovered, such damages shall be so apportioned *that the claim of the employer . . . shall take precedence over that of the injured employee in the proceeds of such recovery, after the deduction of reasonable and necessary expenditures, including attorneys' fees,* incurred by the employee in effecting such recovery." (Emphasis added.) The statute then provides that "[i]f the damages, *after deducting the employee's expenses as provided above,* are more than sufficient to reimburse the employer, damages *shall be assessed* in his favor in a sum sufficient to reimburse him for his claim, and the excess shall be assessed in favor of the injured employee." (Emphasis added.) General Statutes § 31-293 (a).

The legislature specifically stated in § 31-293 (a) that "damages shall be assessed" in the employer's favor, if sufficient, after deduction of the employee's expenses from the total of the award. Therefore, we must determine whether the trial court improperly bypassed the statutory method of apportionment by assessing to Stamford a portion of the plaintiff's attorneys' fees from its medical reimbursement. In determining whether the use of "shall" is mandatory or directory, the test is "whether the prescribed mode of action is of the essence of the thing to be accomplished." *Var-*

*tuli* v. *Sotire,* 192 Conn. 353, 360, 472 A.2d 336 (1984); see also *LeConche* v. *Elligers,* 215 Conn. 701, 710, 579 A.2d 1 (1990). "That test must be applied with reference to the purpose of the statute." *LeConche* v. *Elligers,* supra.

One of the principal purposes of § 31-293 (a) is to reimburse an employer for the expenses it has incurred on account of a workers' compensation claim, when the employee has recovered damages in a third party action in which the employer has properly intervened. J. Asselin, supra, p. 272. "The right of recovery of the employer is superior to the right of the employee to the proceeds of any third party claim. The two purposes served by this provision are: (1) [i]t insures that the party responsible for an injury will not benefit by payments made to the injured employee by the employer[; and] (2) [i]t denies the injured employee double compensation for the same injury." Id.

In light of the purposes of § 31-293 (a), it is clear that the legislature's use of "shall" is mandatory. Therefore, the trial court improperly bypassed the statutory method of apportionment by not awarding to Stamford the total amount of the medical bills that it paid to the plaintiff as workers' compensation. On remand, should the plaintiff recover damages from Mayer, the trial court must first deduct from the total awarded damages the plaintiff's expenditures, including attorneys' fees, and then, if an excess remains, award to Stamford the total amount of medical bills, and other relevant expenditures, that it paid for the plaintiff as workers' compensation. See *Bizzoco* v. *Chinitz,* 193 Conn. 304, 306, 476 A.2d 572 (1984); see also J. Asselin, supra, p. 276.

IV

THE PLAINTIFF'S CROSS APPEAL

On her cross appeal with respect to Stamford, the plaintiff claims that the trial court improperly:

(1) granted Stamford's motion to intervene; (2) ruled that Stamford was no longer obligated to pay her future medical bills related to the accident; and (3) ordered that any specific award granted in the future should belong to Stamford. We agree with the plaintiff on her second claim.

## A

The plaintiff first claims that the trial court improperly granted Stamford's motion to intervene, thereby allowing it to obtain reimbursement of compensation. We disagree.

The plaintiff's original complaint named as defendants both Mayer and Stamford. The office of corporation counsel for Stamford represented both Mayer and the city in this action pursuant to General Statutes § 7-465.[42] On November 17, 1986, the trial court granted Stamford's motion to strike the counts against it because the complaint was based on an allegation of negligence by a fellow employee. After the elimination of Stamford as a defendant, the office of corporation counsel continued to represent Mayer. At no time did the plaintiff provide Stamford with statutory notice of the third party action pursuant to § 31-293.

On March 21, 1989, Stamford filed a motion to intervene, claiming that it was not barred by the thirty day time limitation of § 31-293 (a) because it had never received formal statutory notice of the commencement of the action. The trial court granted the motion to

---

[42] General Statutes § 7-465 provides in pertinent part: "In any such action [pursuant to § 7-465] the municipality and the employee may be represented by the same attorney if the municipality, at the time such attorney enters his appearance, files a statement with the court, which shall not become part of the pleadings or judgment file, that it will pay any verdict rendered in such action against such employee. No mention of any kind shall be made of such statement by any counsel during the trial of such action."

intervene. The plaintiff filed a motion to dismiss the intervening complaint, and the trial court denied the motion.

General Statutes § 31-293 (a) "specifically grants an employer who has paid workers' compensation benefits to an employee the right to join as a party plaintiff in the employee's actions against third party tortfeasors." *Winslow* v. *Lewis-Shepard, Inc.*, 216 Conn. 533, 536, 582 A.2d 1174 (1990). This right to join is contingent, however, on its timely exercise. Id., 537. "An employer who does not receive notice from an employee concerning the institution of a third party action in accordance with § 31-293 '[cannot] be barred from intervening by the passage of time which this statute prescribes, because, until notice is given, the time does not begin to run.' " Id.; see also *Lakewood Metal Products, Inc.* v. *Capital Machine & Switch Co.*, 154 Conn. 708, 710, 226 A.2d 392 (1967).

It is undisputed that the plaintiff did not give Stamford statutory notice of the third party action against Mayer. She argues, however, that because Stamford's corporation counsel represented Mayer, that office was necessarily aware of the third party action and, therefore, the knowledge of the attorney should be imputed to the client, Stamford. Section 31-293 (a) provides for no such exception.

Section § 31-293 (a) states that "[i]f either such employee or such employer brings such action against such third person, he shall forthwith notify the other, in writing, by personal presentation or by registered or certified mail, of such fact and of the name of the court to which the writ is returnable." The statute also provides that "[t]he bringing of any such action against an employer shall not constitute notice to such employer within the meaning of this section." General Statutes § 31-293 (a). If filing of the action against the employer

is insufficient notice to satisfy § 31-293 (a), then filing of such an action against a third party who has the same attorney as the employer is likewise insufficient notice.

The notice requirements are clearly set forth in § 31-293 (a), and the plaintiff did not comply with these requirements. On the facts presented here, we decline to accept the plaintiff's invitation to whittle out an exception to the notice requirements, contrary to the clear legislative intent.

## B

The plaintiff next claims that the trial court improperly ruled that Stamford will no longer be obligated to pay for the plaintiff's future medical bills. In light of our recent decisions in *Enquist* v. *General Datacom,* supra, and *Love* v. *J. P. Stevens & Co.,* supra, we agree.

In *Enquist,* we considered the effect of the 1951 amendment to § 31-293 (a) which added the following language: " 'The rendition of a judgment in favor of the employee or the employer against such party shall not terminate the employer's obligation to make further compensation, including medical expenses, which the compensation commissioner shall thereafter deem payable to such injured employee.' " *Enquist* v. *General Datacom,* supra, 23. We concluded that, although an employer remains liable for future compensation payments to an injured employee, including medical payments, the employer has the right to obtain a credit for unknown future benefits "to the extent that there are excess proceeds from a third party recovery." Id., 25; see also *Love* v. *J. P. Stevens & Co.,* supra, 49–50.

Based upon these recent interpretations of § 31-293 (a), the trial court improperly relieved Stamford of future liability for *all* medical payments. On remand, should the plaintiff recover another award of

damages, the trial court should grant Stamford a credit for future payments that it may be required to make by the commissioner, only to the extent, however, that there are excess proceeds, after payment of expenditures, from that award of damages.

The judgment is reversed and the case is remanded for a new trial.

In this opinion PETERS, C. J., COVELLO and HULL, Js., concurred.

GLASS, J., dissenting in part. I agree with Parts I and II of the majority opinion. The views that I expressed in my dissent in *Enquist* v. *General Datacom,* 218 Conn. 19, 27, 587 A.2d 1029 (1991), and in *Love* v. *J. P. Stevens & Co.,* 218 Conn. 46, 51, 587 A.2d 1042 (1991), however, represent my continuing objection to the majority's position reflected in Part III of the majority opinion, which continues to adhere to, in my view, a misconstruction of General Statutes § 31-293 (a). Accordingly, I dissent.