******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARGARET A. MUELLER *v.* ISIDORE TEPLER ET AL.
(SC 18939)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, and Espinosa, Js.

*Argued December 3, 2013—officially released July 16, 2014\**

*Sean K. McElligott*, with whom, on the brief, was *Joshua D. Koskoff*, for the appellant (plaintiff Charlotte Stacey).

*Eric J. Stockman*, with whom was *Simon I. Allentuch*, for the appellees (defendant Iris Wertheim et al.).

*Opinion*

ROGERS, C. J. The issue that we must resolve in this certified appeal is whether a person who was prevented by state law from marrying or entering into a civil union with her domestic partner at the time that tortious conduct occurred, but who can establish that the couple would have been married if the marriage had not been barred, may maintain a loss of consortium claim arising from the tortious conduct. The plaintiffs, Margaret A. Mueller[1] and Charlotte Stacey, brought this medical malpractice action against the defendants Iris Wertheim and Iris Wertheim, M.D., LLC,[2] seeking damages for personal injuries suffered by Mueller as a result of the defendants' negligence, and for Stacey's resulting loss of consortium. The defendants filed a motion to strike the loss of consortium claims on the ground that the plaintiffs were not married or in a civil union before or during the dates of the negligent acts. The trial court granted the defendants' motion and rendered judgment for them on those claims. Stacey appealed to the Appellate Court, which affirmed the judgment of the trial court on the narrower ground that the plaintiffs' complaint was legally insufficient because they had not alleged that they would have married or entered into a civil union before the dates of the defendants' negligent acts if they had not been barred from doing so under the laws of this state. *Mueller* v. *Tepler*, 132 Conn. App. 742, 748–49, 33 A.3d 814 (2011). We then granted Stacey's petition for certification to appeal to this court. *Mueller* v. *Tepler*, 304 Conn. 909, 39 A.3d 1120 (2012). The issues that we must resolve on appeal are: (1) Did the Appellate Court properly affirm the trial court's judgment in favor of the defendants on grounds distinct from those that the trial court considered when granting the motion instead of remanding the case to the trial court with direction to provide Stacey with an opportunity to amend her complaint?; and (2) If the answer to the first question is no, and Stacey amends her complaint on remand to allege that she and Mueller would have been married when the underlying tort occurred if they had not been barred from doing so under the law of this state, should the trial court grant the defendants' motion to strike Stacey's loss of consortium claims on the ground that the plaintiffs were not married or in a civil union at that time?[3] We answer both questions in the negative.

The opinion of the Appellate Court sets forth the following facts alleged by the plaintiffs in their third amended complaint, and procedural history. "In August, 2001, Mueller was referred to Wertheim after testing by her gynecologist indicated that she had cancer. In October, 2001, Wertheim performed surgery to remove several cancerous tumors from Mueller. These tumors were examined by a pathologist, who identified the cancer as pseudomyxoma peritonei, a cancer of the

appendix. Wertheim either failed to review the pathology report or misinterpreted its findings. As a result of this negligence, Mueller was mistakenly diagnosed with ovarian cancer. Mueller remained under the care of Wertheim until March 5, 2004. Although the error was discovered in April, 2005, Mueller's cancer had progressed to a stage where some of the tumors no longer could be removed surgically.

"On January 10, 2006, Mueller commenced the present action against the defendants seeking recovery for medical malpractice. The third amended complaint, dated November 19, 2007, alleges, in relevant part, that the defendants are liable to [Stacey] for loss of consortium. In support of these claims, the amended complaint contains the following allegations regarding [Stacey's] relationship with Mueller: (1) 'At all times since June, 1985, [Stacey and Mueller] have been domestic partners and have lived together as partners for the past twenty-one years'; (2) 'On or about November 12, 2005, [Stacey and Mueller] were joined in a civil union under Connecticut's civil union statute'; and (3) 'Since 1985, [Stacey and Mueller] . . . have supported each other both financially and emotionally.' " (Footnotes omitted.) *Mueller* v. *Tepler*, supra, 132 Conn. App. 744–45.

"On December 6, 2007, the defendants filed a motion to strike [Stacey's] loss of consortium claims. In this motion, the defendants argued that [Stacey] and Mueller 'had not entered into a legal civil union/marriage prior to or during the dates of the alleged negligent acts [and therefore Stacey] cannot recover for loss of consortium . . . .' [Stacey] filed an objection to this motion [in which she] argued that 'because civil unions were unavailable at the time . . . Mueller was injured, [the complaint] states a valid claim for loss of consortium against [the] defendants.'[4]

"On February 11, 2008, the trial court granted the defendants' motion to strike, stating: 'I simply feel that the defendants are quite correct in pointing out that a consortium claim is not sustainable by people who are not either in a legal marriage or in a legal civil union at the time of the wrong.' " Id., 745–46. Thereafter, the trial court rendered judgment for the defendants on the loss of consortium claims. The jury ultimately returned a verdict in favor of Mueller's estate on the claims of medical malpractice. Id., 746.

Stacey then appealed to the Appellate Court, claiming that she was entitled to damages for loss of consortium because, "although she was not married to Mueller before the defendants' negligent actions occurred, she and Mueller would have formalized their relationship, but for the unconstitutional deprivation of their right to do so under the provisions of state law existing at that time." Id., 746. The defendants contended that the complaint was defective because the plaintiffs had not made the allegation that they were "married or had

entered into a civil union . . . or that [they] wanted to . . . before [Mueller's] injury in 2001." [5] The Appellate Court agreed with the defendants, concluding that, even if it "were to assume that a complaint that includes [an allegation that the plaintiffs would have been married but for the unconstitutional deprivation of their right to do so] states a legally sufficient claim for loss of consortium, the plaintiff[s] did not plead this fact in the third amended complaint." Id., 748. The Appellate Court concluded that, in the absence of such an allegation, the plaintiffs' situation was no different than that of an opposite sex couple who were not married at the time that the underlying tort occurred, for whom a cause of action for loss of consortium is not available. See *Gurliacci* v. *Mayer*, 218 Conn. 531, 564, 590 A.2d 914 (1991) (claim for loss of spousal consortium cannot be maintained when plaintiff was not married to victim of underlying tort when tort occurred). Accordingly, the Appellate Court affirmed the judgment of the trial court on this alternative ground. This certified appeal followed.

I

Stacey's first claim on appeal is that the Appellate Court improperly affirmed the judgment of the trial court in favor of the defendants on an alternative ground that the defendants had not raised in the trial court. Specifically, Stacey claims that: (1) the Appellate Court improperly reviewed the defendants' unpreserved claim that the complaint's loss of consortium claims were legally insufficient because the complaint did not allege that the plaintiffs would have been married or entered into a civil union at the time of the tortious conduct if they had not been barred from doing so under the law of this state; (2) even if the unpreserved claim was reviewable, the Appellate Court improperly determined that the motion to strike should be granted on that alternative ground; and (3) even if the Appellate Court properly reviewed and resolved the defendants' unpreserved claim, it improperly affirmed the judgment of the trial court in favor the defendants instead of remanding the case to the trial court with direction to provide Stacey with an opportunity to replead. We conclude that Stacey's first and second claims are not reviewable because she failed to object to review of the defendants' unpreserved claim in the Appellate Court. With respect to Stacey's third claim that the Appellate Court improperly affirmed the judgment of the trial court in favor of the defendants on this alternative ground instead of remanding the case to the trial court, we conclude that the Appellate Court's ruling is reversible under the plain error doctrine.

The following additional procedural history is relevant to our resolution of this issue. In the plaintiffs' objection to the defendants' motion to strike the loss of consortium claims, they contended that the rationale

of the holding in *Gurliacci* that "the formal marriage relation forms the necessary touchstone to determine the strength of commitment between the two individuals which gives rise to the existence of consortium between them in the first instance"; (internal quotation marks omitted) *Gurliacci* v. *Mayer*, supra, 218 Conn. 564; "only has logical force . . . if the couple was capable of entering into a 'formal marriage relation' prior to the injury." The plaintiffs further contended that "[t]he absence of a civil union between them prior to the date of the injury was simply a function of the legal impossibility and does not in any way bear upon the strength of their commitment."[6] During oral argument on the motion to strike, the plaintiffs argued that the principle that a person "can't . . . marry into a consortium claim is premised entirely on the idea that you have the right to get married and you chose not to." They further argued that they "could not consecrate their commitment to each other in a civil union partnership because . . . they didn't have that ability before October, 2005." See footnote 4 of this opinion. The trial court acknowledged that there might be a distinction between couples who could marry but chose not to and those "who might have wanted to formalize their relationship but were unable to do so under Connecticut law . . . ." The trial court also recognized that, if this court ultimately were to conclude that same sex couples have a constitutional right to marry, such a ruling might allow the court to "go where I think [the plaintiffs are] trying to send us," and that "it may be that the law will develop to the point where [Stacey's loss of consortium] claims will be cognizable . . . ."[7] The trial court concluded, however, that the law had not yet reached that point and granted the defendants' motion to strike on the ground that the plaintiffs had not been married at the time of the alleged tortious conduct.

By the time that the plaintiffs filed their main brief in the Appellate Court, this court had issued its decision in *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 263, 957 A.2d 407 (2008), concluding that this state's marriage laws were unconstitutional under the state constitution to the extent that they barred same sex couples from marrying. See footnote 7 of this opinion. The plaintiffs contended in their brief that "[r]ecognizing that same-sex spouses who would have been married absent legal impossibility may claim loss of consortium damages is the 'wise judicial policy' when the *sole* reason that they were not legally married at the time of the underlying tortious conduct was a now repudiated public policy against legal recognition of lifelong same-sex relationships." (Emphasis in original.) In response, the defendants contended, inter alia, that the plaintiffs had failed to allege in their complaint that they would have entered into a civil union or a marriage before or during the dates of the alleged tortious conduct if they had been legally allowed to do so. Accord-

ingly, they argued, the complaint was "devoid of any allegations which would suggest that . . . Stacey's claim is any different from a heterosexual cohabitating with an unmarried lover." As we have indicated, the Appellate Court agreed with the defendants' contention and affirmed the judgment of the trial court in favor of the defendants on that ground.

Stacey claims on appeal to this court that the Appellate Court improperly resolved the case on the basis of an alternative ground for affirmance that the defendants had failed to raise in the trial court, namely, that the complaint was legally insufficient because it failed to allege that the plaintiffs would have been married or in a civil union at the time of the tortious conduct if doing so had not been barred under the law of this state.[8] The defendants respond that, even if their claim was unpreserved and there were no exceptional circumstances justifying review of it by the Appellate Court,[9] Stacey did not file a reply brief in the Appellate Court objecting to review of the defendants' unpreserved claim or arguing that it should be rejected on the merits. Accordingly, the defendants argue, Stacey's claims that the Appellate Court improperly reviewed the issue and improperly resolved it are abandoned.[10] Stacey responds that she had no obligation to object to the Appellate Court's review of an unpreserved claim or to respond to it on the merits.

We agree with the defendants that, as a general rule, a party may not raise a claim in a certified appeal to this court that it failed to raise in the Appellate Court. *State* v. *Fauci*, 282 Conn. 23, 26 n.1, 917 A.2d 978 (2007) (in certified appeal, "[w]e ordinarily decline to consider claims that [were] not raised properly before the Appellate Court"). Stacey had not explained, and we see no reason, why this rule should not apply to claims raised in a certified appeal to this court concerning the reviewability of unpreserved claims raised by the opposing party in the Appellate Court. It would undermine the interests of judicial economy, the orderly administration of justice and principles of fairness to allow a party to stand silent when the opposing party raises an unpreserved claim in the Appellate Court and then, after the unpreserved claim has been resolved in favor of the party that raised it, to allow the party that stood silent to object to review of the claim for the first time on appeal to this court. Accordingly, we conclude that Stacey's claims that the Appellate Court improperly reviewed and improperly resolved the defendants' unpreserved claim that her complaint was legally insufficient because she failed to allege that she and Mueller would have been married or in a civil union if they had not been barred from doing so under the laws of this state are not reviewable.

We also conclude, however, that the Appellate Court's affirmance of the judgment of the trial court in

favor of the defendants should be reversed pursuant to the plain error doctrine.[11] Under that doctrine, "a reviewing court may in the interests of justice notice plain error not brought to the attention of the [lower] court." (Internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 149, 84 A. 3d 840 (2014). "[T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) Id., 149–50. A ruling that ignores a plainly applicable rule of practice falls within this category of extraordinary situations. See *In re Jonathan P.*, 23 Conn. App. 207, 211, 579 A.2d 587 (1990) (plain error doctrine applies when "a rule of practice is ignored"). Practice Book § 10-44 expressly provides that "[w]ithin fifteen days after the granting of any motion to strike, the party whose pleading has been stricken may file a new pleading . . . ." Thus, a trial court has no discretion to render judgment for the moving party upon granting a motion to strike, unless it is clear that the nonmoving party will be unable to replead. See *Larobina* v. *McDonald*, 274 Conn. 394, 401, 876 A.2d 522 (2005) ("[i]f it is clear on the face of the complaint that it is legally insufficient and that an opportunity to amend it would not help the plaintiff, we can perceive no reason why the defendant should be prohibited from claiming that he is entitled to judgment as a matter of law"). Because, in the present case, the trial court did not strike Stacey's claims on the basis articulated by the Appellate Court, Stacey never was afforded the mandated opportunity to cure the defective pleading. Moreover, Stacey has indicated that, if she is afforded the right to file a new pleading, she will file a substitute complaint alleging that she and Mueller would have been married or in a civil union but for the fact that they were legally barred from doing so.[12] Accordingly, we conclude that it was plain error for the Appellate Court to affirm the judgment of the trial court in favor of the defendants on this alternative ground instead of remanding the case to the trial court with direction to allow Stacey to amend her complaint.[13]

## II

Stacey's second claim on appeal is that, if she amends the complaint on remand to allege that she and Mueller would have been married or in a civil union when the underlying tort occurred if they had not been barred from doing so under the laws of this state, the trial court must deny the defendants' motion to strike her loss of consortium claims pursuant to *Gurliacci* v. *Mayer*, supra, 218 Conn. 564, on the ground that the plaintiffs were not married at that time.[14] We agree.

"We begin by setting out the well established standard of review in an appeal from the granting of a motion

to strike. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on the [defendants' motion] is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 317–18, 907 A.2d 1188 (2006).

We next review the substantive law governing spousal loss of consortium claims. This court first recognized spousal loss of consortium claims in *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 496, 408 A.2d 260 (1979). See id. ("either spouse has a claim for loss of consortium shown to arise from a personal injury to the other spouse caused by the negligence of a third person"). We recognized in that case that an injury to one spouse also damages the spousal relationship, the "intangible elements" of which had "been defined as the constellation of companionship, dependence, reliance, affection sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage"; (internal quotation marks omitted) id., 487; and held that the uninjured spouse should be compensated for any such damage. Id., 496.

This court also has held, however, that a spousal loss of consortium claim may be maintained only if the plaintiff and the injured spouse were married "at the time of the actionable injury to the plaintiff." *Gurliacci* v. *Mayer*, supra, 218 Conn. 562. In *Gurliacci*, the plaintiff, Louis Gurliacci, raised a loss of consortium claim arising from an injury to his wife that had occurred while the couple was engaged to be married and cohabiting, but before they were actually married. Id., 561. This court stated that "[t]he language and reasoning in *Hopson* focus on the marital relationship as it existed on the date of the injury. There is no indication in *Hopson* or later Connecticut decisions to support . . . Gurliacci's claim that a person who is not married to the victim of the tort at the time of the injury may, upon marriage, bring a claim for loss of consortium." (Footnote omitted.) Id., 562–63. This court explained that the rationale for the marriage requirement "is that the formal marriage relation forms the necessary touchstone to determine the strength of commitment between the two individuals which gives rise to the existence of consortium between them in the first instance."[15] (Internal quotation marks omitted.) Id., 564. This court also emphasized that the "intangible factors" that the loss of spousal consortium claim is intended to protect "*are legally recognizable, protected rights arising out of the civil contract of marriage.*" (Emphasis in original; internal quotation marks omitted.) Id.,

562. Accordingly, the court concluded that Gurliacci could not maintain a claim for loss of consortium. Id., 564.

The defendants in the present case contend that Stacey's position is no different than that of the plaintiff in *Gurliacci* and, therefore, that our decision in that case is controlling here. Stacey contends that, to the contrary, her position is different than Gurliacci's position because she was barred from marrying or entering into a civil union with Mueller under the law of this state before the tortious conduct occurred.[16] In addition, she points to the factors that this court considered in *Mendillo* v. *Board of Education*, 246 Conn. 456, 485–96, 717 A.2d 1177 (1998), in determining that it should not recognize claims for loss of parental consortium. In the alternative, Stacey contends that denying her the right to maintain a loss of consortium claim would violate the equal protection clauses of the state constitution under *Kerrigan* because, just as this court held in that case that it was unconstitutional to deprive same sex couples the right to marry, it is unconstitutional to deprive same sex couples of this right that this court has held to be dependent on marriage. In response, the defendants contend that Stacey's reliance on *Kerrigan* is misplaced because the holding of that case was not retroactive.

We agree with Stacey's claim that this court should expand the common-law claim for loss of consortium to members of couples who were not married when the tortious conduct occurred, but who would have been married if the marriage had not been barred by state law.[17] This court previously has recognized that "[i]nherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of stare decisis, which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose." (Internal quotation marks omitted.) *Craig* v. *Driscoll*, 262 Conn. 312, 338–39, 813 A.2d 1003 (2003). Consistent with this principle, "[t]he issue of whether to recognize a common-law cause of action . . . is a matter of policy for the court to determine based on the changing attitudes and needs of society." Id., 339. Accordingly, it is clear that this court *can* expand the common-law action for loss of consortium as required to address new societal attitudes and situations.

We also conclude that we *should* expand the action for loss of consortium to plaintiffs in Stacey's position. As this court recognized in *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 261, the attitudes and needs of society with respect to same sex relationships and marriage have changed significantly in recent decades. See id. ("as we engage over time in the inter-

pretation of our state constitution, we must consider the changing needs and expectations of the citizens of our state" [internal quotation marks omitted]); see also id., 262 ("our conventional understanding of marriage must yield to a more contemporary appreciation of the rights entitled to constitutional protection"). Specifically, society has come to accept the view that committed same sex couples who wish to marry are entitled to the same social and legal recognition as committed opposite sex couples who wish to marry.[18] Accordingly, we agree with Stacey that, in light of this new societal attitude, we must reevaluate this court's decisions in *Hopson* and *Gurliacci*.

We begin with this court's holding in *Gurliacci* v. *Mayer*, supra, 218 Conn. 564, that a plaintiff who was not married to the injured person when the underlying tort occurred cannot maintain a loss of consortium claim. That determination was based on the presumption that, if a couple had the level of mutual commitment that customarily leads to marriage and wanted to be married before the underlying tort occurred, the couple would have been married. See id. ("the formal marriage relation forms the necessary touchstone to determine the strength of commitment between the two individuals" [internal quotation marks omitted]); see also *Gillespie-Linton* v. *Miles*, 58 Md. App. 484, 492, 473 A.2d 947 (1984) ("[p]resumably, when parties wish social and legal recognition of their relationship, they marry"). The court in *Gurliacci* also implicitly assumed that existing marriage laws were consistent with public policy and, therefore, that any couple that wanted to be married and whose marriage would be consistent with public policy could be married. As this court recognized in *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 135, however, the marriage laws that existed at the time that the tortious conduct in the present case occurred were not consistent with public policy because they did not reflect existing societal attitudes toward same sex relationships and marriage. Because the plaintiffs in the present case could not have been married before the date of the tortious conduct even if they had the requisite commitment and desire, and because the bar on same sex marriage was inconsistent with public policy, we conclude that it would be both illogical and inequitable to require proof that the plaintiffs were actually married when the underlying tort occurred as a prerequisite to bringing a loss of consortium claim.

We further conclude that none of the public policies that this court considered in *Hopson* and *Gurliacci* would be undermined by allowing a member of a same sex couple to maintain a loss of consortium claim if he or she can prove that the couple would have been married when the underlying tort occurred if not for the fact that they were barred from doing so under the laws of this state. The public policy in favor of recognizing

such claims is the policy favoring the compensation of individuals for the loss of a "variety of intangible relations which exist between spouses living together in marriage . . . [including] affection, society, companionship and sexual relations." (Citation omitted; internal quotation marks omitted.) *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 487. *Gurliacci* identified the following three public policies in favor of limiting compensation to married couples: if the couple is not married, the couple presumably did not have the "strength of commitment . . . which gives rise to the existence of consortium between them in the first instance"; (internal quotation marks omitted) *Gurliacci* v. *Mayer*, supra, 218 Conn. 564; "an individual should not be permitted to marry a cause of action"; id., 564 n.28; and "liability for injury must be delineated at some point for public policy reasons." Id. Similarly, the court in *Hopson* recognized that loss of consortium claims should not be recognized if doing so would impair reasonable expectations and reliance interests in a "serious way . . . ." *Hopson* v. *St. Mary's Hospital*, supra, 495–96.

Addressing each of these public policy factors in turn, we conclude, first, that the "intangible elements" of the relationship between the members of a same sex couple that would have been married when the underlying tort occurred if they had not been barred from doing so under state law are the same as the "intangible elements" of the marital relationship.[19] Accordingly, a member of such a couple has the same interest in being compensated for the loss of these "intangible elements" as a member of a married couple. Second, as we have explained, marriage cannot logically serve as a proxy for the existence of the commitment that "gives rise to the existence of consortium . . . in the first instance"; (internal quotation marks omitted) *Gurliacci* v. *Mayer*, supra, 218 Conn. 564; when marriage is not an option. Third, if a member of a same sex couple can prove that the couple would have been married when the underlying tort occurred if not for the fact that they were barred from doing so, it would be illogical and unfair to characterize a marriage after the tort occurred as a marriage to "a cause of action"; id., 564 n.28; instead of the formalization of a relationship that already had given rise to "the existence of consortium"; (internal quotation marks omitted) id., 564; and already had all of the hallmarks of a marriage. Fourth, the requirement that a member of an unmarried couple who raises a loss of consortium claim must prove that (1) the couple would have been married when the underlying tort occurred but for the existence of a bar on such marriages under the laws of this state and (2) the marriage would not have been inconsistent with public policy places clear limits on liability for such claims.[20] Finally, as in *Hopson*, we conclude that allowing a plaintiff to maintain a loss of consortium claim under these

circumstances will not impair preexisting expectations or reliance interests in any serious way. *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 495–96. It is highly unlikely that the rule in *Gurliacci* categorically barring loss of consortium claims in the absence of a formal contract of marriage at the time of the underlying tort guided the conduct of any potential tortfeasor. Cf. id., 496 n.5 (prior rule barring loss of consortium claims "may not be reasonably supposed to have determined the conduct of the litigants . . . particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years").

We further conclude that allowing plaintiffs in Stacey's position to maintain a loss of consortium claim would not undermine any of the public policies that this court identified in *Mendillo* v. *Board of Education*, supra, 246 Conn. 456, when it considered whether it should recognize loss of parental consortium claims. Those factors include the public policy against imposing third party liability on tortfeasors; see id., 480–85; and whether extending the cause of action to the new class of plaintiffs would create "significant risks of affecting conduct in ways that are undesirable as a matter of policy"; id., 483; require this court to impose arbitrary limitations on the cause of action; id., 486; impose an undue economic burden on the general public; id., 487; or create a risk of multiple recoveries. Id., 489, 494. In addition, this court has considered the decisions of our sister states; id., 490–92; and the degree to which the new loss of consortium claim resembles a spousal loss of consortium claim. Id., 493.

We recognize, as this court did in *Mendillo*, that we must start from the presumption that no such liability will be imposed absent "satisfaction of a special policy inquiry." [21] Id., 480. As the court also recognized in *Mendillo*, an important factor supporting this presumption is that expanding liability in this way may create "significant risks of affecting conduct in ways that are undesirable as a matter of policy." Id., 483. It is clear, however, that this consideration comes into play primarily when this court is considering third party liability based on an underlying tort *of a particular type* when deterring the tort might also have the unintended consequence of deterring socially beneficial conduct.[22] In the present case, the defendants have not specifically identified any particular form of socially useful conduct that would be deterred if this court allowed Stacey to maintain a loss of consortium claim. Accordingly, although we recognize that the imposition of third party liability is generally disfavored, this particular factor supporting that public policy has no application in the present case.

Recognizing loss of consortium claims under the circumstances of the present case also would not require

this court to impose arbitrary limitations on the cause of action; id., 486; impose an undue economic burden on the general public; id., 487; or create a risk of multiple recoveries. Id., 489. As we have indicated, the requirement that a member of an unmarried couple who raises a loss of consortium claim must prove that the couple would have been married when the underlying tort occurred but for the existence of a bar on such marriages under the laws of this state and that public policy does not disfavor such marriages places inherent limits on the scope of such claims. Accordingly, the economic burden created by our recognition of such claims is inherently limited. Indeed, according to the defendants in the present case, Stacey is the only plaintiff in this state who is seeking to maintain a loss of spousal consortium claim under these circumstances.[23]

In addition, the risk of multiple recoveries under these circumstances is no greater than the risk of multiple recoveries by couples who were married when the underlying tort occurred. See *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 493–94 (difficulty of assessing damages for loss of spousal consortium claims does not militate against recognizing such claims). The requirement that the plaintiff prove that the couple would have been married or in a civil union when the underlying tort occurred if they had not been barred from doing so necessarily means that only one person will be able to bring a loss of consortium claim as the result of an injury to another person.[24]

Finally, we consider the decisions of our sister states. The parties have identified, and our research has revealed, only one case in which the precise issue before us has been addressed, namely, *Charron* v. *Amaral*, 451 Mass. 767, 889 N.E.2d 946 (2008). In *Charron*, the plaintiff, Cynthia Kalish, sought loss of consortium damages arising from injuries suffered by her domestic partner, Michelle Charron, before the couple was married. Id., 768–69. As in the present case, the couple had been unable to marry under the laws of Massachusetts when the underlying tort occurred, but married after the Supreme Judicial Court of Massachusetts held in *Goodridge* v. *Dept. of Public Health*, 440 Mass. 309, 342, 798 N.E.2d 941 (2003), that the bar on same sex marriages violated the state constitution. *Charron* v. *Amaral*, supra, 769. The trial court rendered summary judgment in favor of the defendants on Kalish's loss of consortium claim on the ground that the couple was not married when the underlying tort occurred. Id., 768. On appeal, Kalish claimed that she was entitled to maintain the loss of consortium claim because she and Charron would have been married if the marriage had not been unconstitutionally barred, and that "all the laws that required (exclusively opposite sex) marriage as a prerequisite to certain rights were derivatively unconstitutional" under *Goodridge*. Id., 772.

The Massachusetts Supreme Judicial Court rejected Kalish's claim. The court in *Charron* pointed out that, in *Goodridge*, the court had "stayed the entry of judgment of its decision for 180 days to permit the [l]egislature to take such action as it may deem appropriate. . . . The purpose of the stay was to afford the [l]egislature an opportunity to conform the existing statutes to the provisions of the *Goodridge* decision." (Citation omitted; internal quotation marks omitted.) Id. The court in *Charron* concluded that, because the court in "*Goodridge* granted same-sex couples the right to choose to be married after a specific date," and did not state that "people in same-sex, committed relationships . . . would be considered married before they obtained a marriage license" or that "it was amending, in any way, the laws concerning the benefits available to couples who marry to make up for past discrimination against same-sex couples," Kalish was not entitled to maintain a loss of consortium claim. Id., 773. The court also observed that, "however sympathetic we may be to the discriminatory effects the marriage licensing statute had before our *Goodridge* decision, as counsel conceded at oral argument, to allow Kalish to recover for a loss of consortium if she can prove she would have been married but for the ban on same-sex marriage could open numbers of cases in all areas of law to the same argument." Id.

Relying on *Charron*, the defendants in the present case contend that allowing Stacey to maintain a loss of consortium claim would amount to a retroactive application of the constitutional holding in *Kerrigan* and would open the floodgates to claims for other marital benefits. We find *Charron* unpersuasive. The issue before us in this case is whether we should expand the *judicially created right* to maintain a loss of consortium claim as "a matter of policy . . . based on the changing attitudes and needs of society"; *Craig* v. *Driscoll*, supra, 262 Conn. 339; not whether, as a remedy for the constitutional violation that this court recognized in *Kerrigan*, same sex couples who can prove that they would have been married as of a particular date if their marriage had not been barred should be deemed to have been married as of that date or be entitled retroactively to a particular statutory benefit. Because these two issues involve different considerations, an affirmative answer to the former question does not imply an affirmative answer to the latter question. Most significantly, in determining whether we should expand a common-law action, we are not constrained by any considerations of the constitutional separation of powers or respect for the authority of a coordinate branch of government, as we would be when determining whether a plaintiff is retroactively entitled to a statutory benefit.[25] Cf. *Charron* v. *Amaral*, supra, 451 Mass. 774 (Marshall, C. J., concurring) ("[d]elaying the implementation of a [constitutional] decision is a matter of the deference

owed by one branch of government to the other in the task of effecting an orderly system of laws").

For the foregoing reasons, we conclude that, if Stacey amends the complaint on remand to allege that she and Mueller would have been married or in a civil union when the underlying tort occurred if they had not been barred from doing so under the laws of this state, the trial court must deny the defendants' motion to strike her loss of consortium claims.[26] As this court did in *Hopson*, however, we emphasize that persons in Stacey's position, i.e., those who were barred from marrying when the underlying tortious conduct occurred, may not maintain a loss of consortium claim arising from such conduct when the injured person's "claim for physical injuries has been concluded by judgment or settlement or the running of [the statute of] limitations" before the date that this opinion is officially released. *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 496; see also *Voris* v. *Molinaro*, 302 Conn. 791, 797, 31 A.3d 363 (2011) ("settlement of the predicate claim extinguishes the derivative claim for loss of consortium"); *Marone* v. *Waterbury*, 244 Conn. 1, 10–11, 707 A.2d 725 (1998) (judgments that are not by their terms limited to prospective application are presumed to apply retroactively to *pending cases*).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the trial court's judgment in favor of the defendants on Stacey's loss of consortium claims and to remand the case to the trial court affirming that ruling on the motion to strike, but with direction to allow Stacey to amend her complaint, and, in the event that Stacey does amend her complaint, for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.

* July 16, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Mueller died on January 10, 2009. Thereafter, the trial court granted a motion substituting the executrix of her estate as a plaintiff. References herein to the plaintiffs are to Mueller and Stacy.

[2] The original complaint also named Isidore Tepler and Hematology Oncology, P.C., as defendants. The claims against those defendants ultimately were settled. Accordingly, all references to the defendants in this opinion are to Iris Wertheim and Iris Wertheim, M.D., LLC.

[3] The first issue on which this court granted certification was: "Did the Appellate Court properly affirm the trial court's grant of the defendants' motion to strike based on grounds distinct from those that the trial court considered when granting the motion?" *Mueller* v. *Tepler*, supra, 304 Conn. 909. As we explain more fully in part I of this opinion, we conclude that Stacey's claim that *the Appellate Court improperly determined that the motion to strike should be granted* on the basis of the defendants' unpreserved alternative ground for affirmance is unreviewable in this certified appeal because Stacey failed to object to the review of the unpreserved claim in the Appellate Court. The sole question that is reviewable—because, as we discuss in part I of this opinion, it involves plain error—is whether, upon determining that the trial court properly granted the defendants' motion to strike, *the Appellate Court properly affirmed the judgment of the trial court in favor of the defendants* instead of affording Stacey an opportunity to replead. Accordingly, we have reframed the first certified question. See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 184, 989 A.2d 1048 (2010) (court may

reformulate certified question to conform to issue actually presented).

The second issue on which this court granted certification was: "Did the Appellate Court properly conclude that [Stacey] was not entitled to loss of consortium damages where she was not married to her domestic partner at the time of the partner's injury because neither civil unions nor same sex marriages were recognized at that time?" *Mueller* v. *Tepler*, supra, 304 Conn. 909. The Appellate Court did not reach the merits of this issue, however, because it affirmed the judgment of the trial court on the ground that the plaintiffs' complaint had not alleged that Stacey and Mueller would have been married or in a civil union at the time of the alleged tortious conduct if doing so had not been legally impossible under the laws of this state. Accordingly, we also have reframed the second certified question. As we explain in footnote 14 of this opinion, this claim is reviewable because, in light of our resolution of the first claim, it is likely to arise on remand.

[4] The Appellate Court noted that "the law first afforded [Stacey] the ability to formalize her relationship with Mueller in 2005, under our civil union law. See General Statutes (Supp. 2006) §§ 46b-38aa through 46b-38oo; see also *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 148, 957 A.2d 407 (2008). The third amended complaint alleges that the defendants ceased caring for Mueller on March 5, 2004. The effective date of the civil union statute was October 1, 2005. Public Acts 2005, No. 05-10, § 1." *Mueller* v. *Tepler*, supra, 132 Conn. App. 745 n.5.

[5] The Appellate Court stated that "the complaint does not allege that [Stacey] and Mueller would have formalized their relationship before March 5, 2004, the date Mueller left the defendants' care, had they . . . been allowed to do so under state law." *Mueller* v. *Tepler*, supra, 132 Conn. App. 745. At oral argument before this court, Stacey agreed that, to prevail on her loss of consortium claims, she must prove that she and Mueller would have been married or entered into a civil union by this date if they had been able to do so. Although the defendants in their brief refer repeatedly to October, 2001, the approximate date that Wertheim performed surgery on Mueller, as the date by which, according to them, the plaintiffs would have had to have been married or entered into a civil union for Stacey to raise her loss of consortium claims, they have not challenged the Appellate Court's determination to the contrary on appeal to this court. Accordingly, we assume for purposes of this opinion that March 5, 2004, is the operative date.

[6] In addition, the plaintiffs contended that the "[d]efendants should not be given a free pass simply because it was impossible for the couple to enter a civil union prior to the injury" and "[t]he existence of a marriage is a reasonable place to draw the line in situations where a couple is able to marry prior to the injury."

[7] The trial court issued its oral ruling granting the defendants' motion to strike on February 11, 2008. The trial court granted the defendants' motion for judgment on the loss of consortium claims on August 20, 2008. On October 28, 2008, this court released its decision in *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 957 A.2d 407 (2008), concluding that the state statutory scheme prohibiting marriage between same sex couples was unconstitutional under the state constitution. Id., 260.

[8] "This court previously has held that [o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . This rule applies equally to alternate grounds for affirmance. . . . *New Haven* v. *Bonner*, 272 Conn. 489, 498, 863 A.2d 680 (2005); see also *Thomas* v. *West Haven*, 249 Conn. 385, 390 n. 11, 734 A.2d 535 (1999) ([t]he appellee's right to file a [Practice Book] § 63-4 [a] [1] statement has not eliminated the duty to have raised the issue in the trial court . . . ), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000); *Peck* v. *Jacquemin*, 196 Conn. 53, 62 n.13, 491 A.2d 1043 (1985) (compliance with [Practice Book § 63-4 (a) (1)] is not to be considered in a vacuum; particularly to be considered is its linkage with [Practice Book § 60–5] which provides in part that this court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial ). Such exceptional circumstances may occur where a new and unforeseen constitutional right has arisen between the time of trial and appeal or where the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial. . . . An exception may also be made where consideration of the question is in the interest of public welfare or of justice between the parties." (Footnote omitted; internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 498–500, 43 A.3d 69 (2012).

[9] The defendants concede that their claim was unpreserved, but contend

that exceptional circumstances warranted review of the claim because the plaintiffs did not raise the claim that they would have been married or in a civil union before or during the dates of the tortious conduct if doing so had not been barred under the law of this state until they filed their brief in the Appellate Court. As the foregoing procedural history shows, however, the plaintiffs had claimed consistently in the trial court that Stacey was entitled to raise a loss of consortium claim even though the plaintiffs were not married or in a civil union at the time of the tortious conduct because they had been barred from doing so under this state's laws. We can perceive no reason why the plaintiffs would have made this claim except to emphasize the point that they would have been married or entered into a civil union at the relevant time if they had not been barred from doing so. Although this court's intervening decision in *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 135, that the prohibition on same sex marriages violated the state constitution, *bolstered* Stacey's claim that barring her from seeking loss of consortium damages would be unfair when she and Mueller could not marry under the laws of the state, regardless of the strength of their commitment to each other, and, indeed, is critical to the success of her claim; see part II of this opinion; the essential nature of the claim, i.e., that Stacey was entitled to raise a loss of consortium claim because the plaintiffs would have been married or in a civil union at the relevant time if they had not been barred from doing so, has not changed since the plaintiffs filed their opposition to the defendants' motion to strike. Accordingly, we can perceive no reason why the defendants could not have raised the claim that they raised in their main brief to the Appellate Court in the trial court. We also note, however, that the defendants could have asked the Appellate Court to review the unpreserved alternative ground for affirmance on the ground that the unpreserved claim would be likely to arise on remand if Stacey prevailed on her claim on appeal. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 164–66, 84 A.3d 840 (2014) (reviewing court may review unpreserved alternative ground for affirmance that is likely to arise on remand if basic prerequisites for appellate review are met).

[10] The defendants also contend that the trial court's ruling on their motion to strike was "subsumed" by the Appellate Court's ruling that the complaint was legally insufficient because it failed to allege that the plaintiffs would have been married or in a civil union at the time of the tortious conduct if they had not been barred from doing so under state law. Although we are not entirely certain what this claim means, to the extent that they are claiming that the Appellate Court's ruling was merely duplicative of the trial court's ruling, we disagree. The trial court held that Stacey *could not prevail* on her loss of consortium claim *even if* the plaintiffs would have been married or would have entered into a civil union before the tortious conduct occurred if they had not been barred from doing so in this state. The Appellate Court's ruling was based on the assumption that Stacey *could have prevailed* on her loss of consortium claim if the complaint had included this allegation and she could later prove it. See *Mueller* v. *Tepler*, supra, 132 Conn. App. 748 ("[e]ven if we were to assume that a complaint that [alleged that the plaintiffs would have been married or entered into a civil union if they had not been barred from doing so under the law of this state] states a legally sufficient claim for loss of consortium, [Stacey] did not plead this fact in the third amended complaint"). Thus, the Appellate Court's ruling provided Stacey with a potential route for success on her claim that the trial court's ruling had foreclosed. We conclude in part II of this opinion that, under the circumstances of this case, a complaint alleging that the plaintiffs would have been married if they had not been barred from doing so would be legally sufficient, and the defendants make no claim that, contrary to her representations on appeal, Stacey will be unable to amend the complaint to make the requisite allegation in good faith. But see footnote 26 of this opinion. Accordingly, Stacey must be provided with the opportunity to replead.

[11] Although Stacey did not request plain error review in her brief to this court, we recently have stated that a reviewing court can invoke the plain error doctrine sua sponte as long "as the court provides an opportunity for the parties to be heard . . . and the other threshold conditions for review are satisfied." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A. 3d 840 (2014). After oral argument before this court, we ordered the parties to submit supplemental briefs on the question of whether, assuming that the Appellate Court properly upheld the trial court's granting of the motion to strike Stacey's loss of

consortium claims on an alternative ground, it was plain error to affirm the judgment in favor of the defendants without providing Stacey with an opportunity to file a new pleading pursuant to Practice Book § 10-44.

[12] The defendants contend that application of the plain error doctrine is inappropriate under the circumstances of this case because Stacey did not claim that she and Mueller would have been married if they had not been legally barred from doing so until she filed her appeal in the Appellate Court. We have concluded otherwise. See footnote 9 of this opinion. The defendants also contend that the Appellate Court did not commit plain error because amending the complaint would be futile. Specifically, they contend that Stacey cannot amend her complaint to render it legally sufficient because she cannot allege that she and Mueller were married when the tort occurred, as required by *Gurliacci.* As we have explained, however, to render the complaint legally sufficient, Stacey need only allege that she and Mueller *would have been married* when the tort occurred if they had not been legally barred from doing so. Accordingly, we reject this claim.

[13] In light of this conclusion, we reject the defendants' claim that Stacey lacked standing to maintain a loss of consortium claim because she failed to allege that, but for the fact that she was barred from marrying or entering into a civil union in this state, she would have been married when the underlying tortious conduct occurred.

[14] As we have indicated, the Appellate Court did not reach this question because it concluded that the plaintiffs' complaint did not adequately allege that they would have been married or in a civil union at the relevant time if they had been able to do so. See footnote 3 of this opinion. We address the question in the interest of judicial economy, on the assumption that it will arise on remand. *Cumberland Farms, Inc.* v. *Groton,* 247 Conn. 196, 201 n.5, 719 A.2d 465 (1998) (in certified appeal, this court, in interest of judicial economy, addressed issue that had been raised in Appellate Court and in petition for certification, but that had not been addressed by Appellate Court).

[15] In addition, the court observed in *Gurliacci* v. *Mayer,* supra, 218 Conn. 564 n.28, that "[o]ther reasons often stated in support of the requirement of an existing marital relationship at the time of the injury are: (1) an individual should not be permitted to marry a cause of action . . . (2) an individual marries the person in her existing state of health, and thereby assumes the risk that the resulting injury will result in a deprivation . . . and (3) liability for injury must be delineated at some point for public policy reasons." (Citations omitted.)

[16] Stacey contends that, under these circumstances, as a matter of logic and equity, instead of applying the bright line rule of *Gurliacci,* we should consider the public policy factors that underlay this court's decisions in *Hopson* and *Gurliacci.* The defendants respond that it is unclear whether Stacey is claiming that "every person can file a loss of consortium claim and a jury will examine the nature and quality of the relationship to determine if damages are appropriate"; that this court should "[c]reate an exception to the common law for unmarried gay couples who were not civilly united before the injury occurred"; or that this court should treat Stacey and Mueller "as retroactively civilly united . . . ." We conclude that, under a fair reading of Stacey's brief, she is making none of these claims. Rather, she is claiming that, as a matter of law, a person who can prove that his or her domestic partner was injured by tortious conduct, and that he or she would have married or entered into a civil union with the injured person before the tortious conduct occurred if doing so had not been barred, is entitled to maintain a loss of consortium claim, consistent with the principles enunciated in *Hopson* and *Gurliacci.*

[17] Accordingly, we need not address Stacey's constitutional claim. See *Moore* v. *McNamara,* 201 Conn. 16, 20, 513 A.2d 660 (1986) ("[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case").

[18] See also *Lawrence* v. *Texas,* 539 U.S. 558, 571–72, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) ("[W]e think that our laws and traditions in the past half century are of most relevance here. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex."); id., 572 ("[t]his emerging recognition should have been apparent when [*Bowers* v. *Hardwick,* 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986), in which the United States Supreme Court upheld the constitutionality of laws prohibiting sodomy] was decided"); *In re Marriage Cases,* 43 Cal. 4th 757, 821, 183 P.3d 384, 76 Cal. Rptr. 683 (2008) ("There can be no question

but that, in recent decades, there has been a fundamental and dramatic transformation in this state's understanding and legal treatment of gay individuals and gay couples. California has repudiated past practices and policies that were based on a once common viewpoint that denigrated the general character and morals of gay individuals, and at one time even characterized homosexuality as a mental illness rather than as simply one of the numerous variables of our common and diverse humanity."); *In re Marriage Cases*, supra, 822 ("the change in this state's past treatment of gay individuals and homosexual conduct is reflected in scores of legislative, administrative, and judicial actions that have occurred over the past [thirty] or more years"); *Goodridge* v. *Dept. of Public Health*, 440 Mass. 309, 334, 798 N.E.2d 941 (2003) ("Massachusetts has responded supportively to the changing realities of the American family . . . and has moved vigorously [in cases dating back to 1993] to strengthen the modern family in its many variations. . . . Moreover, we have repudiated the common-law power of the [s]tate to provide varying levels of protection to children based on the circumstances of birth [in a case dating back to 1987]. . . . [Under case law dating back to 1980], [t]he best interests of the child standard does not turn on a parent's sexual orientation or marital status." [Citations omitted; internal quotation marks omitted.]); *Lewis* v. *Harris*, 188 N.J. 415, 438, 908 A.2d 196 (2006) ("[t]imes and attitudes have changed, and there has been a developing understanding that discrimination against gays and lesbians is no longer acceptable in this [s]tate, as is evidenced by various laws and judicial decisions [dating back to 1993] prohibiting differential treatment based on sexual orientation"); *Baker* v. *State*, 170 Vt. 194, 223–24, 744 A.2d 864 (1999) ("[W]hatever claim may be made in light of the undeniable fact that federal and state statutes—including those in Vermont—have historically disfavored same-sex relationships, more recent legislation [dating back to 1977] plainly undermines the contention. . . . In 1992, Vermont was one of the first states to enact statewide legislation prohibiting discrimination in employment, housing, and other services based on sexual orientation. . . . Sexual orientation is among the categories specifically protected against hate-motivated crimes in Vermont. . . . Furthermore, as noted earlier, recent enactments of the General Assembly have removed barriers to adoption by same-sex couples, and have extended legal rights and protections to such couples who dissolve their 'domestic relationship.' " [Citations omitted.]). We note that Connecticut repealed its law prohibiting sodomy in 1969; see Public Acts 1969, No. 828, § 214 (repealing General Statutes [Rev. to 1968] § 53-216); long before the United States Supreme Court declared such laws unconstitutional in *Lawrence* v. *Texas*, supra, 578; enacted legislation prohibiting discrimination on the basis of sexual orientation in 1991; see Public Acts 1991, No. 91-58, codified as amended at General Statutes § 46a-81a et seq.; and enacted legislation in 2000 providing that, for purposes of adoption, "[t]he best interests of a child are promoted when the child is part of a loving, supportive and stable family, whether that family is a nuclear, extended, split, blended, single parent, adoptive or foster family." Public Acts 2000, No. 00-228, codified as amended at General Statutes § 45a-727a (3). Accordingly, we conclude that the societal needs and expectations in this state regarding same sex relationships that underlay this court's decision in *Kerrigan* emerged no later than the societal changes discussed in these cases, which was clearly long before March 5, 2004, the date of the tortious conduct in the present case.

[19] We recognize that, unlike for married couples, for same sex couples who could not marry under the laws of this state, these "intangible elements" were not "legally recognizable, protected rights . . . ." *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 487. Thus, a member of a same sex couple could not, for example, sue the other member for divorce and seek alimony or support payments for failing to provide these intangible elements. This court recognized in *Gurliacci*, however, that it is "the strength of commitment between the two individuals which gives rise to the existence of consortium between them in the first instance"; (internal quotation marks omitted) *Gurliacci* v. *Mayer*, supra, 218 Conn. 564; and the "formal marriage relation"; (internal quotation marks omitted) id.; is merely a proxy for that commitment. To conclude that a member of a committed same sex couple who was barred from securing his or her legal right to the consortium of his or her domestic partner is barred from seeking compensation for the loss of such consortium because he or she had no legally enforceable right to it would be circular and unfair.

[20] Contrary to the defendants' suggestion in their brief, nothing in this opinion supports the proposition that "every person can file a loss of consor-

tium claim and a jury will examine the nature and quality of the relationship to determine if damages are appropriate . . . ." See footnote 16 of this opinion. Rather, to raise such a claim, a plaintiff who was not married to the victim of the underlying tort when the tort occurred must prove that the couple *would have been married* but for the existence of a prohibition on such marriages, and that public policy does not disfavor such marriages. When public policy disfavors the marriage of a particular couple—when, for example, the individuals were too young or too closely related to marry under the laws of this state—it would violate the public policy against the creation of consortium between such persons to recognize a loss of consortium claim, regardless of the couple's level of commitment to each other. It is clear, therefore, that such couples may not maintain a loss of consortium claim.

With respect to couples who *could have been married* before the underlying tort occurred, nothing in this opinion changes the bright line rule that this court adopted in *Gurliacci*, under which the courts will conclusively presume that, if the couple was not married, they did not have "the strength of commitment . . . which gives rise to the existence of consortium between them in the first instance." (Internal quotation marks omitted.) *Gurliacci* v. *Mayer*, supra, 218 Conn. 564. We recognize that there may be situations in which the presumption may not reflect reality, as, for example, when a husband-to-be was injured as he proceeded down the church aisle to be married. Nevertheless, the rule's general reasonableness as applied to couples who could have married before the underlying injury occurred and its ease of application outweigh the potential harshness of its application in outlying cases.

[21] This court stated in *Mendillo* v. *Board of Education*, supra, 246 Conn. 480, that "the imposition of third party liability on a tortfeasor is an exception to the general rule of the scope of tort liability that requires satisfaction of a special policy inquiry." The court explained that "[o]ur reluctance to recognize causes of action in tort based on third party liability, in the absence of satisfaction of a special policy inquiry, is based in part upon our realization that the scope of the tortfeasor's third party liability, measured only by pure rules of foreseeability could lead to unlimited liability." (Internal quotation marks omitted.) Id., 482. "Moreover, where the primary victim of the tortious behavior recovers for her own injuries, those direct consequences of the wrongful conduct are compensated and the wrongdoer does not escape liability." Id.

[22] See *Mendillo* v. *Board of Education*, supra, 246 Conn. 483, citing *Zamstein* v. *Marvasti*, 240 Conn. 549, 560–61, 692 A.2d 781 (1997) (court declined to impose upon psychiatrist duty of care to suspected child abuser because doing so could "discourage[e] such professionals . . . from performing sexual abuse evaluations of children altogether"); see *Zamstein* v. *Marvasti*, supra, 557 (declining to "recognize that psychiatrists, or other mental health professionals, who evaluate children for evidence of sexual abuse, owe a duty to exercise reasonable care in the performance of the evaluation, to the person suspected of committing the abuse"); see also *Mendillo* v. *Board of Education*, supra, 483, citing *Fraser* v. *United States*, 236 Conn. 625, 634–35, 574 A.2d 811 (1996) (psychotherapist owes no duty of care to third party injured by psychotherapist's outpatient "based partly on the risk of inhibiting the openness that is essential to the therapist-patient relationship and partly on the risk of over-encouraging involuntary hospitalization of the mentally ill").

[23] We conclude later in this opinion that a plaintiff who was prevented from marrying under circumstances like those in the present case may not maintain a loss of consortium claim if the statute of limitations for the underlying tort has expired or if the underlying claim was concluded by judgment or settlement before the official release date of this opinion. Cf. *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 496.

[24] Even if a plaintiff could prove that, had the marriage not been statutorily barred, he or she would have been married to an injured person who was already married to another person, recovery of loss of consortium damages would be barred because bigamy violates public policy.

[25] In this regard, it is important to note that this court has on occasion left the crafting of a remedy for an unconstitutional legislative act to the legislature in the first instance. See *Sheff* v. *O'Neill*, 238 Conn. 1, 45–46, 678 A.2d 1267 (1996) ("In light of the complexities of developing a legislative program that would respond to the constitutional deprivation that the plaintiffs had established, we concluded, in [*Horton* v. *Meskill*, 172 Conn. 615, 653, 376 A.2d 359 (1977)], that further judicial intervention should be stayed

to afford the General Assembly an opportunity to take appropriate legislative action. . . . Prudence and sensitivity to the constitutional authority of coordinate branches of government counsel the same caution in this case.'' [Citation omitted; internal quotation marks omitted.])

[26] The defendants suggest that Stacey cannot prevail on her loss of consortium claims because she has not alleged and cannot establish that it was *impossible* for the plaintiffs to have been married or to have entered into a civil union before the date of the underlying tortious conduct. Specifically, they contend that, before the tortious conduct occurred, the plaintiffs could have married or entered a civil union in a place where same sex marriage or civil unions were permitted, such as Vermont or the Netherlands. Although we recognize that these issues may arise on remand, we decline to address them because the record is inadequate for this court to determine whether the plaintiffs could have married or entered a civil union elsewhere before the underlying tortious conduct occurred, as either a practical or a legal matter, and, more fundamentally, because the parties have not briefed the question of whether Stacey must establish that it was impossible for the plaintiffs to have married or entered a civil union at that time or, instead, whether she can prevail if she can establish that they would have been married or in a civil union but for the fact that they were barred from doing so under the laws of this state.